No. 24-2990

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

ADOLPH MICHELIN,
*Petitioner-Appellee*,

v.

WARDEN MOSHANNON VALLEY PROCESSING CENTER, et al.,
*Respondents-Appellants*.

On Appeal from the United States District Court
for the Western District of Pennsylvania
No. 23-cv-00022 (Hon. Patricia L. Dodge)

## RESPONSE BRIEF OF PETITIONER-APPELLEE

| | |
|---|---|
| Margaret Kopel | R. Stanton Jones |
| Jonah Eaton | Andrew T. Tutt |
| NATIONALITIES SERVICE CENTER | Casey Corcoran |
| 1216 Arch St, 4th Floor | Katie Weng |
| Philadelphia, PA 19107 | ARNOLD & PORTER |
| | KAYE SCHOLER LLP |
| William T. Sharon | 601 Massachusetts Ave., NW |
| Nicole L. Masiello | Washington, DC 20001 |
| ARNOLD & PORTER | (202) 942-5000 |
| KAYE SCHOLER LLP | andrew.tutt@arnoldporter.com |
| 255 West 55th Street | |
| New York, NY 10019 | |

*Counsel for Petitioner-Appellee Adolph Michelin*

## Oral Argument Requested

April 30, 2025

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................1

STATEMENT OF THE ISSUE ..................................................................................5

STATEMENT OF RELATED CASES ......................................................................5

STATEMENT OF THE CASE ...................................................................................5

    A.   History of Civil Actions ...............................................................................5

    B.   The Equal Access to Justice Act ...............................................................10

    C.   Factual Background and Proceedings Below.............................................15

SUMMARY OF ARGUMENT .................................................................................20

STANDARD OF REVIEW ......................................................................................22

ARGUMENT ............................................................................................................22

I.    EAJA Applies to Mr. Michelin's Habeas Action Challenging His
Civil Immigration Detention ........................................................................23

    A.   As a Rule, Statutes That Say "Civil Actions" Encompass
Habeas ......................................................................................................23

    B.   When Congress Uses The Phrase "*Any* Civil Action"—As In
EAJA—It Always Encompasses Habeas Actions ...................................29

    C.   EAJA's Purpose And History Underscore That It Applies Here............33

    D.   EAJA Unambiguously Encompasses Habeas Actions..............................38

II.   The Government's Counterarguments Fail....................................................39

    A.   The Government's Sovereign Immunity Argument is Meritless
Because EAJA Unambiguously Encompasses Habeas Actions ..............40

        1.   The Sovereign Immunity Canon Applies At the End, Not the
Beginning, of the Interpretive Process .............................................40

        2.   There Is No Ambiguity In EAJA .....................................................43

    B.   The Government's Effort to Reclassify Habeas Actions As
Presumptively Not Civil Actions Is Meritless .......................................47

    C.   The Government's Reliance on *Daley v. Federal Bureau of
Prisons* Is Misplaced ..............................................................................52

CONCLUSION.........................................................................................................55

CERTIFICATE OF BAR MEMBERSHIP................................................................56

CERTIFICATE OF SERVICE .................................................................................57

CERTIFICATE OF COMPLIANCE ........................................................................58

**Page(s)**

**Cases**

*Ali v. Fed. Bureau of Prisons*,
552 U.S. 214 (2008) .................................................................................32

*Application of Spracher*,
150 F. Supp. 555 (D. Alaska 1957) ........................................................36

*Ardestani v. INS*,
502 U.S. 129 (1991) .................................................................................34

*Astrue v. Ratliff*,
560 U.S. 586 (2010) ............................................................................34, 35

*Banister v. Davis*,
590 U.S. 504 (2020) .........................................................................3, 26, 49

*Barco v. Witte*,
65 F.4th 782 (5th Cir. 2023) ....................................................................49

*Bell v. Wolfish*,
441 U.S. 520 (1979) .................................................................................30

*Berman v. Schweiker*,
713 F.2d 1290 (7th Cir. 1983) .................................................................34

*Boudin v. Thomas*,
732 F.2d 1107 (2d Cir. 1984) ..................................................................52

*Boumediene v. Bush*,
553 U.S. 723 (2008) .................................................................................30

*Braden v. 30th Jud. Cir. Ct. of Kentucky*,
410 U.S. 484 (1973) .............................................................................2, 30

*Browder v. Dir., Dep't of Corr. of Illinois*,
434 U.S. 257 (1978) ...........................................................................25, 45

*Brown v. Gardner*,
513 U.S. 115 (1994) .................................................................................44

*Bufkin v. Collins*,
145 S. Ct. 728 (2025)........................................................................33

*Callwood v. Enow*,
230 F.3d 627 (3d Cir. 2000) ....................................................27, 48

*Cazun v. Attorney General*,
856 F.3d 249 (3d Cir. 2017) .............................................................32

*Clarke v. INS*,
904 F.2d 172 (3d Cir. 1990) .............................................................34

*Clean Air Council v. United States Steel Corp.*,
4 F.4th 204 (3d Cir. 2021)...............................................................23

*Comm'r, I.N.S. v. Jean*,
496 U.S. 154 (1990)...................................................................34, 45

*Cross v. Burke*,
146 U.S. 82 (1892)...............................................................................8

*Daley v. Fed. Bureau of Prisons*,
199 F. App'x 119 (3d Cir. 2006) ...................................................4, 52

*Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,
601 U.S. 42 (2024)...................................................................41, 46

*Dolan v. U.S. Postal Serv.*,
546 U.S. 481 (2006)...........................................................................41

*Ellis v. Dyson*,
421 U.S. 426 (1975)...........................................................................26

*Ewing v. Rodgers*,
826 F.2d 967 (10th Cir. 1987) ..........................................36, 52, 53

*FAA v. Cooper*,
566 U.S. 284 (2012)...........................................................40, 44, 46

*Farnsworth v. Territory of Montana*,
129 U.S. 104 (1889).........................................................................26

*Fenstermacher v. State*,
  19 Or. 504 (1890)............................................................................................8

*Fisher v. Baker*,
  203 U.S. 174 (1906).......................................................................................26

*Freza v. Att'y Gen. United States*,
  49 F.4th 293 (3d Cir. 2022) ....................................................................34, 35

*German Santos v. Warden Pike Cnty. Corr. Facility*,
  965 F.3d 203 (3d Cir. 2020) .........................................................................30

*Gideon v. Wainwright*,
  372 U.S. 335 (1963).......................................................................................34

*Gillette v. Warden Golden Grove Adult Corr. Facility*,
  109 F.4th 145 (3d Cir. 2024) ........................................................................30

*Handron v. HHS*,
  677 F.3d 144 (3d Cir. 2012) .........................................................................46

*Harris v. Nelson*,
  394 U.S. 286 (1969)................................................................................47, 48

*Heflin v. United States*,
  358 U.S. 415 (1959).......................................................................................26

*Henderson v. Frank*,
  155 F.3d 159 (3d Cir. 1998) .........................................................................27

*Henderson v. Shinseki*,
  562 U.S. 428 (2011).......................................................................................51

*Hilborn v. United States*,
  163 U.S. 342 (1896).......................................................................................31

*In re Hill*,
  775 F.2d 1037 (9th Cir. 1985) ......................................................................19

*Hilton v. Braunskill*,
  481 U.S. 770 (1987).................................................................................1, 45

*Hockemeyer v. Thompson*,
49 N.E. 1059 (Ind. 1898) ...........................................................24, 25

*Holmes v. Jennison*,
39 U.S. (14 Pet.) 540 (1840) ...............................................................8

*Hope v. Warden York Cnty. Prison*,
972 F.3d 310 (3d Cir. 2020) .............................................................30

*Houston v. Lack*,
487 U.S. 266 (1988)...........................................................................26

*INS v. Lopez-Mendoza*,
468 U.S. 1032 (1984).............................................................................4

*Keeney v. Tamayo-Reyes*,
504 U.S. 1 (1992).........................................................................27, 48

*Kholyavskiy v. Schlecht*,
479 F. Supp. 2d 897 (E.D. Wis. 2007) .........................................33, 36

*Kiareldeen v. Ashcroft*,
273 F.3d 542 (3d Cir. 2001) .............................................................53

*King v. Burwell*,
576 U.S. 473 (2015)...........................................................................44

*King v. St. Vincent's Hosp.*,
502 U.S. 215 (1991)...........................................................................44

*Kisor v. Wilkie*,
588 U.S. 558 (2019)...........................................................................42

*State ex rel. Kochtitzky v. Riley*,
101 S.W. 567 (Mo. 1907) ....................................................................8

*Kosak v. United States*,
465 U.S. 848 (1984)...........................................................................41

*Kurtz v. Moffitt*,
115 U.S. 487 (1885)...........................................................................26

*Lackey v. Stinnie*,
  145 S. Ct. 659 (2025) ..................................................................23

*Lee v. Johnson*,
  799 F.2d 31 (3d Cir. 1986) ....................................................28, 51

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) ...........................................................37, 42

*Marincas v. Lewis*,
  92 F.3d 195 (3d Cir. 1996) ...................................................36, 46

*Mayle v. Felix*,
  545 U.S. 644 (2005) ..................................................................26

*McCarthy v. Harper*,
  449 U.S. 1309 (1981) ................................................................26

*Milwaukee Cnty. v. M.E. White Co.*,
  296 U.S. 268 (1935) ....................................................................9

*Newmark v. Principi*,
  283 F.3d 172 (3d Cir. 2002) .....................................................22

*Nguyen v. Att'y Gen. of New Jersey*,
  832 F.3d 455 (3d Cir. 2016) .....................................................30

*In re Nwanze*,
  242 F.3d 521 (3d Cir. 2001) ........................................27, 30, 48

*O'Brien v. Moore*,
  395 F.3d 499 (4th Cir. 2005) .................................................52, 53

*Obando-Segura v. Garland*,
  999 F.3d 190 (4th Cir. 2021) .................................................49, 50

*Parrott v. Gov't of Virgin Islands*,
  230 F.3d 615 (3d Cir. 2000) .....................................................27

*Patel v. Att'y Gen. of the United States*,
  426 F. App'x 116 (3d Cir. 2011) ..............................................34

*Pharmacia Corp. v. Clayton Chem. Acquisition LLC,*
    382 F. Supp. 2d 1079 (S.D. Ill. 2005)......................................................9

*United States, ex rel. Polansky v. Exec. Health Res., Inc.,*
    599 U.S. 419 (2023)..........................................................................33

*Raplee v. United States,*
    842 F.3d 328 (4th Cir. 2016) .............................................................9

*Reid v. Covert,*
    351 U.S. 487 (1957)....................................................................31, 32

*Richlin Sec. Serv. Co. v. Chertoff,*
    553 U.S. 571 (2008)............................................40, 41, 42, 43, 45

*Riddle v. Dyche,*
    262 U.S. 333 (1923)........................................................................26

*Ross v. Bernhard,*
    396 U.S. 531 (1970)........................................................................10

*Ryan v. Gonzales,*
    568 U.S. 57 (2013)......................................................................1, 25

*Santa Clara Pueblo v. Martinez,*
    436 U.S. 49 (1978)..........................................................................25

*Santana v. United States,*
    98 F.3d 752 (3d Cir. 1996) ................................ 3, 28, 29, 38, 39, 46, 47, 48, 49

*Scarborough v. Principi,*
    541 U.S. 401 (2004)........................................................................22

*Schlanger v. Seamans,*
    401 U.S. 487 (1971).............................................2, 28, 46, 47, 48

*Sebelius v. Cloer,*
    569 U.S. 369 (2013)..................................................................40, 41

*SEC v. Jarkesy,*
    603 U.S. 109 (2024)........................................................................24

*Sekhar v. United States*,
570 U.S. 729 (2013)..................................................................................24

*Stafford v. Briggs*,
444 U.S. 527 (1980)..............................................................................25, 38

*Streicher v. Washington*,
1992 WL 73508 (D.D.C. Mar. 20, 1992) ...........................................30

*Sullivan v. Hudson*,
490 U.S. 877 (1989)..................................................................................45

*Ex parte Tom Tong*,
108 U.S. 556 (1883)..............................................................................8, 51

*United States v. Chem. Found.*,
272 U.S. 1 (1926)......................................................................................10

*United States v. Idaho ex rel. Dir., Idaho Dep't of Water Res.*,
508 U.S. 1 (1993)......................................................................................41

*United States v. Johnson*,
529 U.S. 53 (2000)....................................................................................33

*United States v. Lilly*,
536 F.3d 190 (3d Cir. 2008) ...................................................................30

*United States v. Rutherford*,
120 F.4th 360 (3d Cir. 2024) .................................................................43

*United States v. Smith*,
499 U.S. 160 (1991)..................................................................................45

*Vacchio v. Ashcroft*,
404 F.3d 663 (2d Cir. 2005) .........................................13, 19, 34, 50, 53

*Walker v. Williams*,
2019 WL 3307132 (W.D. Pa. May 21, 2019) ....................................30

*Walker v. Williams*,
2019 WL 3306731 (W.D. Pa. July 22, 2019) .....................................30

*Wis. Cent. Ltd. v. United States*,
  585 U.S. 274 (2018) ............................................23, 37

*Ex parte Yerger*,
  75 U.S. (8 Wall.) 85 (1868) ..............................1, 26

*Zadvydas v. Davis*,
  533 U.S. 678 (2001) .......................................4

**Statutes and Regulations**

18 U.S.C.
  § 3006A..........................................................52
  § 3626(g) .......................................................31

28 U.S.C.
  § 1252............................................................32
  § 1331.....................................................3, 30, 50
  § 1404(a) .............................................2, 3, 29, 50
  § 1441(a) ...............................................3, 30, 50
  § 1442(a) ...............................................3, 30, 50
  § 1446(a) ...............................................3, 30, 50
  § 1914............................................................2
  § 1914(a) .......................................................31
  § 2412...........................................................11
  § 2412(d)(1)(A)...................... 1, 5, 19, 22, 23, 33, 35, 51
  § 2412(d)(2)(F) .................................................51

Civil Rules Enabling Act,
  Pub. L. No. 73-651, 48 Stat. 1064 (1934) ....................9

Equal Access to Justice Act,
  Pub. L. No. 96-481, 94 Stat.
  2327 (1980)................................1-4, 10, 14, 20-23, 29, 32-39, 42, 44-48, 51-53

8 C.F.R. § 241.4(k)...............................................17

**Rules**

Fed. R. Civ. P. 1 (1937) ....................................10, 27

Fed. R. Civ. P. 2 ...............................................9

Fed. R. Civ. P. 81(a)(2) (1937) ..............................................................10

Fed. R. Civ. P. 81(a)(4) .........................................................................27

**Legislative Materials**

*Equal Access to Justice Act of 1979: Hearings on S. 265 Before the
Subcomm. on Improvements in Jud. Mach. of the S. Comm. on the
Judiciary*, 96th Cong. (1979) ..........................................................14, 37

H.R. Rep. No. 89-1535 (1966) ...............................................................11

H.R. Rep. No. 96-1418 (1980) ..........................................................13, 37

S. Rep. No. 89-1329 (1966) ....................................................................11

S. Rep. No. 96-253 (1979) ......................................................................37

**Other Authorities**

1 Moore's Manual-Federal Practice and Procedure § 1.60 (2024)..........10

1 William Blackstone, Commentaries on the Laws of England (1772) ...................6

3 William Blackstone, Commentaries on the Laws of England (1772) ............5, 6, 7

4 William Blackstone, Commentaries on the Laws of England (1772) ...............5, 7

4 Charles Alan Wright & Arthur R. Miller, *Federal Practice and
Procedure* § 1041 (4th ed. 2024) ................................................7, 8, 41

25 Am. Jur. *Habeas Corpus* § 160 (1940) ............................................36

Antonin Scalia & Bryan A. Garner, *Reading Law* (2012).......................41

*Ballentine's Law Dictionary* (3d ed. 1969) ............................................25

*Black's Law Dictionary* (5th ed. 1979)..................................................25

Charles E. Clark & James Wm. Moore, *A New Federal Civil
Procedure I. the Background*, 44 Yale L.J. 387 (1935) ...................7, 8

David L. Noll, *A Reader's Guide to Pre-Modern Procedure*,
65 J. Legal Educ. 414 (2015)..............................................................6

Douglas King, *Complex Civil Litigation and the Seventh Amendment Right to a Jury Trial*, 51 U. Chi. L. Rev. 581 (1984) ........................................6, 9

Gregory C. Sisk, *Twilight for the Strict Construction of Waivers of Federal Sovereign Immunity*, 92 N.C. L. Rev. 1245 (2014) ..............................41

Gregory Sisk, *Litigation With the Federal Government* (2d ed. 2023) ...................32

Ingrid V. Eagly & Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 U. Pa. L. Rev. 1 (2015) ............................35

Pamela S. Karlan, *Disarming the Private Attorney General*, 2003 U. Ill. L. Rev. 183 (2003) .......................................................................12

*Radin Law Dictionary* (2d ed. 1970) ....................................................................25

Seth Katsuya Endo, *Fee Retrenchment in Immigration Habeas*, 90 Fordham L. Rev. 1489 (2022) ....................................................................37

Stephen B. Burbank & Sean Farhang, *Rights and Retrenchment: The Counterrevolution Against Federal Litigation* (2017) ..................................11, 12

Thomas O. Main, *Traditional Equity and Contemporary Procedure*, 78 Wash. L. Rev. 429 (2003).........................................................................7

U.S. Court of Appeals for Veterans Claims, Rules of Practice and Procedure (July 16, 2024), https://www.uscourts.cavc.gov/rules_of_practice.php.......................................51

## STATEMENT CONCERNING ORAL ARGUMENT

Appellee believes oral argument will materially assist the Court in adjudicating the issues raise in this appeal.

**INTRODUCTION**

This case turns on the meaning of nine words in the Equal Access to Justice Act ("EAJA"): "any civil action (other than cases sounding in tort)." 28 U.S.C. § 2412(d)(1)(A). If the government's position is not "substantially justified," prevailing parties can get fees, expenses, and costs in "any civil action" against the United States, with the sole exception of tort cases.

The government in this case held Adolph ("Lee") Michelin in civil immigration detention for eighteen months. After Mr. Michelin prevailed in a habeas corpus proceeding, the district court granted his request for attorneys' fees under EAJA because the government's position in his civil immigration proceeding was not "substantially justified." The government does not dispute this finding on appeal, but insists that Mr. Michelin's habeas proceeding was not a "civil action" under EAJA. The district court correctly rejected that argument.

Habeas actions fall within the phrase "any civil action" right alongside every other non-tort civil action. For nearly two centuries, the Supreme Court has "consistently recognized that habeas corpus proceedings are civil in nature," *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987), and that habeas actions are "civil action[s]" and "civil cases," *Ryan v. Gonzales*, 568 U.S. 57, 72 (2013); *Ex parte Yerger*, 75 U.S. (8 Wall.) 85, 96 (1868). Contemporary dictionaries and court rules likewise

establish that the plain, ordinary meaning of "civil action" includes habeas proceedings.

Were there any doubt, EAJA's use of "*any* civil action" decides this case. For all its emphasis on the "unique, hybrid" features of habeas proceedings, even the government admits that habeas actions are "technically civil actions." Opening Brief for Appellants, *Abioye v. Warden Moshannon Valley Processing Center*, No. 24-3198, Dkt. 14 at 21 (3d Cir. Mar. 10, 2025) ("Br.") (quoting *Schlanger v. Seamans*, 401 U.S. 487, 490 n.4 (1971)). So when a statute covers "*any* civil action," it necessarily encompasses habeas. *See, e.g.*, 28 U.S.C. § 1404(a) (allowing courts to transfer "any civil action"); *Braden v. 30th Jud. Cir. Ct. of Kentucky*, 410 U.S. 484, 499 n.15 (1973) (Section 1404(a) "of course" applies to habeas petitions). And when Congress wants to cover "any civil action" *except* habeas, it expressly writes just that. *See, e.g.*, 28 U.S.C. § 1914 (specifying filing fee for "any civil action … except … habeas").

Despite conceding that "habeas proceedings [are] technically civil actions," Br. 27 (citation omitted), the government contends that the words "civil action" lack a plain meaning because, in the abstract, they do not "*invariably* encompass[] habeas proceedings." *Id.* at 21 (emphasis added). Thus, the government claims, EAJA is "ambiguous," so the sovereign immunity canon applies. The government is wrong several times over.

To start, the sovereign immunity canon applies only if a phrase remains ambiguous *after* the court exhausts the traditional tools of statutory interpretation, which the government largely ignores. But that scarcely matters anyway, because the government offers no evidence that Congress meant for EAJA to *depart* from the plain meaning of "civil action," which includes habeas. Even in the rare cases where *particular statutes* omit habeas from the phrase "civil action," courts acknowledge that "[h]abeas corpus proceedings are technically civil actions" and are exempt only if context reveals congressional intent to exclude habeas. *Santana v. United States*, 98 F.3d 752, 754 (3d Cir. 1996). In EAJA, however, every indicia of congressional intent underscores that the statute *includes* habeas actions.

Perhaps recognizing this, the government takes its argument a step further and claims that habeas is not a "civil action" at all, but actually "a category unto itself." *Id.* at 30. But the Supreme Court has held over and over that "[h]abeas proceedings, for those new to the area, are *civil in nature*." *See Banister v. Davis*, 590 U.S. 504, 507 (2020) (emphasis added). That is why numerous statutes that use the phrase "civil action" indisputably encompass habeas, which would make no sense if habeas were in a completely different "category." 28 U.S.C. § 1331 (conferring jurisdiction to hear "civil actions"); 28 U.S.C. § 1404(a) (allowing courts to transfer "any civil action"); 28 U.S.C. §§ 1441(a), 1442(a), 1446(a) (right to remove "any civil action").

3

The government notes that habeas proceedings do not follow some of the procedural rules that some other civil actions follow. But courts categorize proceedings as "civil" or "criminal" based on the type of right being enforced. Habeas actions do not stop being civil actions simply because they have some special rules. And anyway, EAJA shifts fees in civil actions that look far stranger than any habeas action, such as veterans' benefits adjudications in the Veterans Court, which follow entirely *sui generis* rules.

Finally, the government places substantial stock in a single line of unreasoned dicta in an unpublished decision from an unargued *pro se* appeal. *See* Br. 5, 9, 25-26, 28, 30-31, 34 (relying on *Daley v. Fed. Bureau of Prisons*, 199 F. App'x 119 (3d Cir. 2006)). But for many reasons, that decision cannot save the government's case.

The words "any civil action (other than cases sounding in tort)" in EAJA unambiguously encompass habeas actions. Indeed, cases like Mr. Michelin's fall in the heartland of the phrase "any civil action" because every aspect of Mr. Michelin's case was indisputably civil. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (immigration detention is "civil detention"); *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984) (removal proceedings underlying such detentions are "purely civil action[s]"). A claim that is "civil in nature," challenging "civil detention," resulting from a "civil action," is not *exempt* from EAJA's phrase "any civil action (other than cases sounding in tort)." The Court should affirm.

## STATEMENT OF THE ISSUE

Whether a habeas action that challenges civil detention in connection with civil proceedings qualifies as "any civil action" under 28 U.S.C. § 2412(d)(1)(A).

## STATEMENT OF RELATED CASES

This case has not been before this Court previously.

Counsel is aware of the following related cases pending in this Court and elsewhere: *Abioye v. Warden Moshannon Valley Correctional Center*, No. 24-3198 (3d Cir.);[1] *Daley v. Choate, et al.*, No. 24-1191 (10th Cir.).

## STATEMENT OF THE CASE

### A.    History of Civil Actions

"Civil action" is a term with deep roots stretching back to early English law, where "civil actions" encompassed all proceedings to enforce private or civil rights—including habeas actions. That understanding crossed the Atlantic to the United States, where it eventually developed from a common-law concept into a formal category of proceedings.

**1.** Early English law had two "primary objects": "the establishment of rights, and the prohibition of wrongs." 3 William Blackstone, Commentaries on the Laws of England 1 (1772). Some rights were "private" or "civil" rights. *Id.* at 2. The infringement of such rights was a "private wrong," 4 Blackstone, *supra*, at 5, which

---

[1] This Court *sua sponte* consolidated this case with *Abioye* for disposition only. *See* Order at Doc. 12.

had only one remedy in English courts: a "civil suit or action." 3 Blackstone, *supra*, at 2-3.

"Civil actions" took many shapes and sizes. Generally speaking, a party initiated a "civil action" by petitioning the king for a letter—called a writ—"that directed a court to resolve a dispute in a particular way." David L. Noll, *A Reader's Guide to Pre-Modern Procedure*, 65 J. Legal Educ. 414, 417 (2015). Over time, these writs grew increasingly "specialized," with each type corresponding "to a separate 'form of action,' which was defined according to the specific nature of the wrong alleged." Douglas King, *Complex Civil Litigation and the Seventh Amendment Right to a Jury Trial*, 51 U. Chi. L. Rev. 581, 587 (1984). Forms of action governed nearly everything: the "substantive law" applied, "the kind of procedure the court would use, the kind of evidence the plaintiff had to present to recover, and the remedies the courts would award." Noll, *supra*, at 417-18.

According to Blackstone, "the most celebrated writ in the English law" was the writ of habeas corpus. 3 Blackstone, *supra*, at 129. English law recognized "personal liberty" as one of the highest civil rights, 1 Blackstone, *supra*, at 129, and the writ of habeas corpus *ad subjiciendum* redressed infringements of that civil right by demanding that courts "examine into [the] validity" of "every commitment" and "the reason for which it is made." 3 Blackstone, *supra*, at 133. If the commitment

was unjustified—*i.e.*, if the petitioner's personal liberty had been infringed—a writ of habeas could correct that "civil injury" by releasing the petitioner. *Id.* at 127, 129.

Separate from civil actions like habeas cases were criminal prosecutions, which redressed *public* wrongs. Public wrongs were "breach[es] and violation[s]" not of any individual's civil rights, but "of the public rights and duties, due to the whole community"—what were called, even then, "crimes and misdemeanors." 4 Blackstone, *supra*, at 5. Given that discrete purpose, English law recognized the "very apparent" distinction between actions to remedy infringements of public rights (criminal prosecution) and infringements of civil rights (civil actions). *Id.* at 6-7.

**2.** Early American law followed English practice. *See* Thomas O. Main, *Traditional Equity and Contemporary Procedure*, 78 Wash. L. Rev. 429, 449 (2003). Colonials overthrew the king but largely retained the writ-driven system in state courts. 4 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1041 (4th ed. 2024). Federal courts followed the same system, as their procedures were tied to state practices by design. *See* Charles E. Clark & James Wm. Moore, *A New Federal Civil Procedure I. the Background*, 44 Yale L.J. 387, 398-402 (1935).

Crucially, the new American legal system adopted England's rigid civil-criminal dichotomy. Here, too, it was elemental that "[a] civil action is instituted for the purpose of enforcing a private or civil right, or to redress a private wrong, as

distinguished from actions instituted to punish crimes, which are known as 'criminal actions.'" *Fenstermacher v. State*, 19 Or. 504, 506 (1890); *see also, e.g.*, *State ex rel. Kochtitzky v. Riley*, 101 S.W. 567, 569 (Mo. 1907) ("It will be seen from an examination of these various definitions that the phrases, 'civil case' and 'civil suit' refer to the legal means by which the rights and remedies of private individuals are enforced or protected, in contradistinction to the words 'criminal cases,' which refer to public wrongs and their punishment.").

Consistent with that divide, American courts repeatedly affirmed the common-law understanding that habeas actions were civil actions. As early as 1840, Chief Justice Taney thought it "too plain for argument" that habeas petitions are "civil actions." *Holmes v. Jennison*, 39 U.S. (14 Pet.) 540, 565, 567 (1840). Four decades later, the Supreme Court reiterated why that is so: "The writ of *habeas corpus* is the remedy which the law gives for the enforcement of the civil right of personal liberty," and because "[p]roceedings to enforce civil rights are civil proceedings," a "writ of *habeas corpus* … [is] a civil proceeding." *Ex parte Tom Tong*, 108 U.S. 556, 559-60 (1883). A decade later, the Court declared the issue "well settled." *Cross v. Burke*, 146 U.S. 82, 88 (1892).

**3.** States meanwhile were leading the way in "abolish[ing]" the procedural formalities of the highly technical writ system and replacing them with simpler, more uniform civil codes of procedure. 4 Wright & Miller, *supra*, § 1041; *see* Clark

& Moore, *supra*, at 390-93. Congress followed suit in passing the Civil Rules Enabling Act, Pub. L. No. 73-651, 48 Stat. 1064 (1934), which led to the Federal Rules of Civil Procedure.

Rule 2 swept away most remaining vestiges of the old common-law writ system through a single sentence: "There shall be one form of action to be known as 'civil action.'" Fed. R. Civ. P. 2 (1937). Those thirteen words "famously abolished distinctions between various types of judicial proceedings," *Raplee v. United States*, 842 F.3d 328, 332 (4th Cir. 2016), and installed, in "[]place[]" of the old "writ system," "a unitary civil action," King, *supra*, at 606.

Notably, the term "civil action" retained its broad historical sweep. Courts still defined civil suits as simply those that "do not involve criminal prosecution or punishment," *Milwaukee Cnty. v. M.E. White Co.*, 296 U.S. 268, 271 (1935), and Rule 2 built on that common-law understanding, *see, e.g.*, *Pharmacia Corp. v. Clayton Chem. Acquisition LLC*, 382 F. Supp. 2d 1079, 1087 (S.D. Ill. 2005) (relying on Rule 2 to hold that "the natural meaning of 'civil action' is clearly a non-criminal judicial proceeding"); Fed. R. Civ. P. 2 Advisory Committee's Note to 1937 Adoption ("Reference to actions at law or suits in equity in all statutes should be treated as referring to the civil action prescribed" by Rule 2.). And even as the Federal Rules preserved some specific procedures for habeas cases and certain other types of civil actions, the Rules still recognized those cases as "all suits of a civil

nature" that qualified as "civil actions" under Rule 2's umbrella. Fed. R. Civ. P. 1 (1937); *see* Fed. R. Civ. P. 81(a)(2) (1937).

Following the Rules' promulgation, "nothing turns now upon the form of the action or the procedural devices by which the parties happen to come before the court." *Ross v. Bernhard*, 396 U.S. 531, 540 (1970). "For any litigation of a civil claim or defense in federal court, there is only one form of action, and that form of litigation is referred to as a civil action." 1 Moore's Manual—Federal Practice and Procedure § 1.60 (2024).

### B.     The Equal Access to Justice Act

In the 1960s and 1970s, Congress passed legislation shifting attorney's fees and costs to prevailing parties in certain civil actions, including those against the government. Congress first passed EAJA's predecessor statute in 1966, then expanded the use of fee-shifting provisions in civil rights statutes, and finally passed EAJA itself in 1980.

**1.** Since the Founding, the government had turned its sovereign immunity into a one-way street for costs and attorney's fees: The government could recover costs and fees when it won but refuse to pay them when it lost. *See, e.g.*, *United States v. Chem. Found.*, 272 U.S. 1, 20 (1926).

Congress began addressing that disparity in 1966. By that point, even the Department of Justice had grown concerned that "[w]hen the United States sues on

a claim and wins, it may be awarded costs; when the United States sues and loses, costs may not be awarded against it." H.R. Rep. No. 89-1535, at 4 (1966). The Department accordingly proposed a bill to allow courts to award costs to prevailing parties "in *any action* brought by or against the United States." *Id.* at 5. (emphasis added). The House Judiciary Committee then modified that language by inserting the word "civil" between "any" and "action." *See id.* at 1. This change was not meant to be substantive; as the Committee explained, it "merely clarifie[d] the intent of the bill," namely, to put "the private litigant and the United States on an equal footing as regards the award of court costs." *Id.* at 2, 3. The Department of Justice agreed with the edit, and the bill became law. S. Rep. No. 89-1329, at 4 (1966).

Going forward, prevailing parties could recover "a judgment for costs"—but not yet attorney's fees—"in any civil action brought by or against the United States." 28 U.S.C. § 2412 (1976).

**2.** Meanwhile, a heated debate had begun between three groups of policymakers over the expansion and enforcement of civil rights in the United States. First, there was a group of civil rights advocates, who sought not only to expand civil rights protections through new legislation but also to enforce those rights through the creation of muscular "NLRB-style civil rights agenc[ies]," armed with broad "administrative adjudicatory powers" and a New Deal mindset. Stephen B. Burbank & Sean Farhang, *Rights and Retrenchment: The Counterrevolution Against Federal*

*Litigation* 9 (2017). On the other side, there was a second group that strongly opposed all civil rights bills and enforcement mechanisms. *See id.* Caught in between was the third group, which often favored new civil rights legislation but was generally skeptical about the expansion of both government regulation and bureaucracy. *See id.*

Compromise was first achieved between the civil rights and small-government advocates in the Civil Rights Act of 1964, which created new civil rights but traded public for private enforcement in the form of private causes of action as well as cost- and fee-shifting provisions. *See id.* Civil rights groups were "bitterly disappoint[ed]" at "the substitution of private lawsuits—even with fee-shifting—for strong administrative powers," but the model gained popularity over the next decade and a half on both sides of the aisle. *Id.* at 10. For civil rights advocates, private enforcement proved an unexpectedly successful way of enforcing civil rights; for small-government advocates, it proved an attractive alternative to the expansion of the federal bureaucracy. *See id.* at 10-16. As a result, private causes of action—as well as accompanying fee-shifting provisions—became the default enforcement mechanism for many civil rights bills passed during this period. *See id.*; Pamela S. Karlan, *Disarming the Private Attorney General*, 2003 U. Ill. L. Rev. 183, 205-06 (2003).

**3.** By 1980, the fee-shifting aspect of the model had become so successful that Congress was ready to expand it to cases involving the government. Federal enforcement power had become a danger in the eyes of many congressmen, who were concerned that the "rapid growth" of the government's power, combined with its vast "resources and expertise," would enable it to violate citizens' rights without much pushback. H.R. Rep. No. 96-1418, at 9-10 (1980). Contesting government action seemed too costly for most private individuals and small businesses, making it "more practical to endure an injustice than to contest it," *id.* at 9, and raising the risk that the government could "in effect coerce compliance" with its whims, *id.* at 10.

Congress considered guarding against such "unreasonable exercise[s] of Governmental authority," *id.* at 12, by expanding the 1966 cost-shifting law to allow prevailing parties in any civil action against the government to collect attorney's fees whenever the government's position was not substantially justified. The purpose of such fee-shifting would be three-fold: first, it would "eliminate financial disincentives for those who would defend against unjustified governmental action"; second, it would help "compensate victims of unjustified litigation by the Government"; and third, it would "deter the unreasonable exercise of Government authority." *Vacchio v. Ashcroft*, 404 F.3d 663, 670 (2d Cir. 2005) (citations omitted).

Cost, however, was a potential sticking point, especially for the Department of Justice, which had lost its earlier enthusiasm for paying opposing counsels' bills. On April 20, 1979, the government presented these objections at a Senate hearing. *See Equal Access to Justice Act of 1979: Hearings on S. 265 Before the Subcomm. on Improvements in Jud. Mach. of the S. Comm. on the Judiciary*, 96th Cong. (1979). The Deputy Assistant Attorney General explained that the government opposed the draft bill because, among other things, it "could cost United States taxpayers." *Id.* at 45. In an effort to quantify that cost, he explained that in fiscal year 1978, there had been 46,811 civil cases commenced in the federal district courts in which the United States was a party. *Id.* at 50. He then broke down those civil cases by category, explaining that 79 percent came from only six types of civil actions: "real property actions … (23 percent), social security matters (21 percent), *prisoner petitions* (12 percent), contract disputes (11 percent), tax cases (6 percent), or tort actions (6 percent)." *Id.* (emphasis added). He noted that the draft bill excluded two of the six categories—"tax and tort cases," each 6 percent—and would accordingly "affect 88 percent of this caseload," including all "prisoner petitions." *Id.*

Congress was not moved by such concerns, and on October 21, 1980, it passed EAJA by overwhelming majorities. Pub. L. No. 96-481, § 204(a), 94 Stat. 2327.

## C. Factual Background and Proceedings Below

Mr. Michelin's childhood in Jamaica was mired in tragedy. Growing up in a city near Kingston, he and his family lived in constant fear of gang violence. App'x 250. Gang members routinely came to Mr. Michelin's home with guns and threatened to burn down his house and kill his family. App'x 250. When Mr. Michelin became a teenager, those same gangs tried to recruit him, threatening him with torture and death if he refused. App'x 251. He and other members of his family resisted these recruitment efforts, but the gangs murdered two of his cousins for refusing to join. App'x 251; App'x 122. Ultimately, gangs killed at least ten of Mr. Michelin's friends and family members. App'x 122; App'x 252. In 2010, Mr. Michelin fled to the U.S., where he has lived ever since. App'x 252.

In 2012, Immigrations and Customs Enforcement officers detained Mr. Michelin for overstaying his visa, and he was placed in removal proceedings. App'x 122; App'x 154; App'x 253. He was released on bond and moved to Florida, where he applied for an adjustment of status. App'x 122; App'x 253-255. Although he told immigration officials of his fears about returning to Jamaica, nobody advised him that he had the option to seek asylum, so he did not apply. App'x 123; App'x 253-254. In 2016, Mr. Michelin's removal proceedings ended, and his application for adjustment of status was denied. An immigration judge in Florida

ordered that he be removed. App'x 21-22; App'x 123. Mr. Michelin was not removed, however, and around 2019 he relocated to Philadelphia. App'x 123.

In January 2022, ICE arrested Mr. Michelin and detained him in the Moshannon Valley Processing Center in Pennsylvania. App'x 22; App'x 124. DHS issued a Notice of Custody Determination, which—as the government later admitted—incorrectly stated that Mr. Michelin was being detained under 8 U.S.C. § 1226, on the theory that he posed a "potential threat to public safety and/or property." App'x 22; App'x 396. ICE arranged for Mr. Michelin's removal at the end of March 2022. App'x 23.

Meanwhile, Mr. Michelin obtained *pro bono* immigration counsel, who advised him for the first time that he could apply for asylum. App'x 124; App'x 414. Through his new counsel, Mr. Michelin moved the Board of Immigration Appeals to reopen his case and stay his removal based on his eligibility for asylum. App'x 23, App'x 125. The BIA granted the stay but did not rule on Mr. Michelin's request to reopen. App'x 23. Mr. Michelin remained in custody. App'x 23.

In October 2022, Mr. Michelin's counsel wrote to the government asking whether "it [still was] ICE's position that Mr. Michelin [was being] detained pursuant to [8 U.S.C. § 1226]." App'x 398. The government responded with one word: "Yes." App'x 398. Mr. Michelin's counsel also asked the government when DHS planned to conduct a review of Mr. Michelin's custody so he could submit

evidence justifying his release. App'x 398; App'x 400. The government responded that Mr. Michelin would not have a custody review for another five months. App'x 398.

Mr. Michelin petitioned the immigration court for a bond hearing under Section 1226, which the court held on January 17, 2023. App'x 23; App'x 128-29. At the hearing, the government claimed for the first time that Mr. Michelin was *not* being detained under Section 1226, meaning the immigration court lacked jurisdiction to conduct the hearing. Contrary to its prior representations, the government now claimed that Mr. Michelin was in custody under 8 U.S.C. § 1231(a)(6), App'x 23; App'x 129, which—as implemented by regulation— requires ICE to conduct periodic "custody reviews" in "[c]ontinued detention cases" and to notify detainees in advance so they can submit evidence, 8 C.F.R. § 241.4(k). Shockingly, the government stated on the record that ICE had "just *completed* a custody evaluation" for Mr. Michelin. App'x 402 (emphasis added). Mr. Michelin's counsel immediately notified the government that he intended to submit evidence supporting his release, but the government responded that it was too late to do so because the evaluation had "already been sent up the chain of command." App'x 402.

Two days later, ICE sent Mr. Michelin a written decision continuing his detention. App'x 459. ICE represented in the decision that it was "made based on

the review of [his] file," the "factors for consideration set forth in" the relevant regulations, and (remarkably) "consideration of the information [Mr. Michelin] submitted to ICE's reviewing officials"—*i.e.*, none. App'x 459. By this time, Mr. Michelin had been detained for more than a year without a bond hearing. App'x 12.

On February 6, 2023, Mr. Michelin filed a habeas petition in the Western District of Pennsylvania. He argued that his continued detention without a bond hearing or adequate custody review violated due process. App'x 130-148.

The court agreed. After a comprehensive legal analysis, it concluded that Mr. Michelin was entitled to "a bond hearing before an immigration judge at which the government bears the burden to justify his detention by clear and convincing evidence." App'x 26-37. On September 5, 2023, eighteen months into Mr. Michelin's detention, he appeared before an immigration judge for a bond hearing. App'x 5. The judge ordered his immediate release on bond. App'x 5. Mr. Michelin has been living in Philadelphia ever since. App'x 5.

After his release, Mr. Michelin sought attorneys' fees under EAJA. App'x 5. The court began its analysis by rejecting the government's argument that "any civil action" in EAJA excludes habeas claims. App'x 6. First, the court explained, "the Third Circuit has adjudicated motions for attorneys' fees in immigration habeas cases without questioning whether such cases fall outside the ambit of the EAJA." App'x 6-7. Second, recognizing that courts "are divided" on the issue, the court

found "the reasoning of the Second and Ninth Circuits, as well as recent district court cases that have held that immigration habeas cases are 'civil actions' covered by the EAJA, to be more persuasive." App'x 7-8 (citing *Vaccio v. Ashcroft*, 404 F.3d 663, 670-72 (2d Cir. 2005), and *In re Hill*, 775 F.2d 1037, 1040-41 (9th Cir. 1985)). "This conclusion," the court observed, "is consistent with the recognition that immigration proceedings themselves are civil in nature." App'x 8. Third, the court noted that "the only type of 'civil actions' that the EAJA excludes from its reach are those 'sounding in tort,'" but Congress chose not to similarly exclude habeas actions. App'x 9 (cleaned up).

The court then concluded that the government's "pre-litigation position with respect to Michelin's custody was [not] substantially justified." App'x 13. As a result, it granted $15,841.60 in fees and expenses. App'x 19.

On appeal, the government does not dispute that Mr. Michelin was the "prevailing party" or that his detention was not "substantially justified." 28 U.S.C. § 2412(d)(1)(A). Nor does it suggest that "special circumstances" preclude his fee award. *Id.* Instead, the government argues only that Mr. Michelin is not entitled to the fees he was awarded because he allegedly did not prevail in "any civil action." *Id.*

19

# SUMMARY OF ARGUMENT

**I.** EAJA unambiguously applies to habeas actions challenging civil detention, as every tool of statutory construction establishes.

EAJA awards fees in "any civil action." When EAJA and its predecessor were enacted, the use of "any civil action" in a statute was understood to encompass *all* non-criminal proceedings in federal court—that is, a proceeding brought to enforce civil or private rights. Courts and Congress clearly understood that habeas actions challenging civil detention fell into that category.

Congress's use of the word "any" before the phrase "civil action" was no accident. "Any" gives "civil action" its most expansive meaning, encompassing not only "garden-variety" civil actions but also those with "unique" features. In other statutes, Congress has expressly carved habeas actions out of the phrase "any civil action" (or "any civil proceeding") when it has intended to treat habeas actions differently. Here, Congress expressly excluded *other* categories of cases from the phrase but chose to leave habeas in. Indeed, it would be inconsistent with EAJA's structure to exclude habeas actions challenging civil immigration detention while including challenges to the underlying immigration proceedings.

EAJA's purposes further confirm the point. Each of EAJA's purposes would be advanced by permitting the collection of fees by habeas petitioners who successfully challenge substantially unjustified civil detention.

Finally, EAJA's history removes any doubt about its reach. During congressional hearings, the government expressly represented that EAJA would apply to cases like Mr. Michelin's, and EAJA's predecessor was specifically drafted to encompass those kinds of cases. Thus, EAJA unambiguously covers habeas challenges to civil immigration detention.

**II.** The government errs in arguing otherwise.

First, the government misconstrues the sovereign immunity canon. The government argues the canon applies whenever text, read in a vacuum, could be understood in more than one way. But the canon kicks in only if the text is ambiguous *after* the court exhausts the traditional tools of statutory interpretation. Here, where the ordinary meaning of "civil action" includes habeas, only evidence of congressional intent to *depart* from that meaning could create ambiguity. But there is no such evidence. Rather, every traditional tool of statutory construction points in the same direction: EAJA encompasses habeas actions.

Second, the government is wrong to the extent it contends "civil action" *lacks* a plain meaning and presumptively *excludes* habeas. The Supreme Court has held over and over that habeas actions are civil actions, and even the government admits this "technically" is true. Even to the extent habeas actions have "unique" or "hybrid" *features*, they are "technically civil actions," and EAJA captures "*any* civil action," a phrase universally understood to encompass habeas. For that reason and

21

others, the government also misplaces its reliance on two recent decisions by other courts of appeals that overlooked this point.

Finally, the government's extensive reliance on one line of dicta in an unpublished decision from a panel of this Court is misplaced, because that disposition did not grapple with the issue, and, if anything, indicated that habeas challenges to civil immigration detention *are* "civil actions" under EAJA.

## STANDARD OF REVIEW

A district court's interpretation of EAJA presents a legal question subject to this Court's plenary review. *Newmark v. Principi*, 283 F.3d 172, 174 (3d Cir. 2002). A district court's award of attorney fees under the EAJA is reviewed for abuse of discretion. *Id*.

## ARGUMENT

Congress enacted EAJA in 1980 "to eliminate the barriers that prohibit small businesses and individuals from securing vindication of their rights in civil actions and administrative proceedings brought by or against the Federal Government." *Scarborough v. Principi*, 541 U.S. 401, 406 (2004) (citation omitted). The Act awards attorney's fees to prevailing parties in "*any civil action* (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action." 28 U.S.C. § 2412(d)(1)(A) (emphasis added). If a private party prevails in

such a case, the court must award attorney's fees "unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." *Id.*

The question in this case is whether the phrase "any civil action" includes a habeas action challenging civil detention in connection with civil proceedings. The answer is "yes," as all the traditional tools of statutory interpretation demonstrate. In arguing otherwise, the government misunderstands both the application of the sovereign immunity canon and the import of the relevant caselaw.

## I. EAJA Applies to Mr. Michelin's Habeas Action Challenging His Civil Immigration Detention

### A. As a Rule, Statutes That Say "Civil Actions" Encompass Habeas

Statutory interpretation "begin[s] with the text." *Lackey v. Stinnie*, 145 S. Ct. 659, 666 (2025). Congress did not define the phrase "any civil action" in EAJA, so this Court must "start with the phrase's plain meaning," *Clean Air Council v. United States Steel Corp.*, 4 F.4th 204, 209 (3d Cir. 2021), focusing on the text's "ordinary meaning at the time Congress enacted the statute," *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (cleaned up).

Here, the ordinary meaning of the words "civil action" includes habeas actions challenging civil detention, a conclusion that follows from the common-law, dictionary definitions, centuries of relevant precedent, multiple court rules, and many other congressional enactments.

**1.** One of the most "settled principle[s] of interpretation" is "that, absent other indication, 'Congress intends to incorporate the well-settled meaning of the common-law terms it uses.'" *Sekhar v. United States*, 570 U.S. 729, 732 (2013) (citation omitted). This rule assumes that "[w]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word." *Id.* at 733 (citation omitted). In short: "[W]hen Congress transplants a common-law term, the old soil comes with it." *SEC v. Jarkesy*, 603 U.S. 109, 125 (2024) (citation omitted).

The phrase "civil action" is just such a common-law term, and courts have consistently understood it to distinguish cases brought to enforce civil or private rights from criminal cases. *See supra* pp. 5-10. One court aptly summarized that "it would seem that there is absolutely no reasonable or logical escape from the conclusion ... that the words 'civil cases' and 'civil causes' are to be construed, and we are imperatively required to construe them, as including all cases other than criminal cases." *Hockemeyer v. Thompson*, 49 N.E. 1059, 1060 (Ind. 1898).

Contemporary legal dictionaries confirm that Congress uses the term "civil action" as a catch-all to reference any case other than a criminal proceeding—that is, any action brought to enforce private (civil) rights (including the right to personal liberty) rather than to correct public (criminal) wrongs. For example, *Black's Law*

*Dictionary* defined "[c]ivil action" as an "[a]ction brought to enforce, redress, or protect private rights"; in general, it explained, the term refers to "all types of actions other than criminal proceedings." *Black's Law Dictionary* 222 (5th ed. 1979). Other contemporary legal dictionaries defined "civil action" in a similarly expansive way. *See, e.g.*, *Radin Law Dictionary* 55 (2d ed. 1970) ("A legal proceeding brought to enforce a civil right or obtain redress for its violation."); *Ballentine's Law Dictionary* 202 (3d ed. 1969) ("comprehending every conceivable cause of action, whether legal or equitable, except such as are criminal in the usual sense").[2]

**2.** Countless courts thus have held that habeas actions—especially those challenging civil detention—are "civil actions." It is not even a close question: The Supreme Court and its Justices alone have issued dozens of opinions to that effect. *See, e.g.*, *supra* pp. 8-9; *Ryan*, 568 U.S. at 72, 73 (twice describing a federal habeas proceeding as a "civil action"); *Browder v. Dir., Dep't of Corr. of Illinois*, 434 U.S. 257, 269 (1978) ("It is well settled that habeas corpus is a civil proceeding."); *Stafford v. Briggs*, 444 U.S. 527, 543 (1980) ("[H]abeas corpus is 'a civil action'"); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 60 (1978) ("Congress clearly has power to authorize civil actions against tribal officers, and has done so with respect

---

[2] Earlier dictionaries likewise defined "the ordinary meaning of the word 'civil'" to be "[i]n contradistinction to criminal," "[r]elating to rights and remedies sought by action or suit distinct from criminal proceedings." *Hockemeyer*, 49 N.E. at 1060 (quoting definitions from several dictionaries).

to habeas corpus relief . . . ."); *Heflin v. United States*, 358 U.S. 415, 418 n.7 (1959) ("[A] petition for a writ of habeas corpus is . . . an independent civil suit." (citation omitted)); *Riddle v. Dyche*, 262 U.S. 333, 335-36 (1923) ("The writ of habeas corpus is . . . an independent civil suit . . . ."); *Fisher v. Baker*, 203 U.S. 174, 181 (1906) ("The proceeding is in habeas corpus, and is a civil, and not a criminal, proceeding."); *Farnsworth v. Territory of Montana*, 129 U.S. 104, 113 (1889) ("[T]his court has held [a writ of habeas corpus] to be a civil, and not a criminal, proceeding . . . ."); *Kurtz v. Moffitt*, 115 U.S. 487, 494 (1885) ("A writ of habeas corpus . . . is a civil suit or proceeding, brought by him to assert the civil right of personal liberty . . . ."); *Yerger*, 75 U.S. (8 Wall.) at 96 (calling habeas corpus among "the most important powers in civil cases of all the highest courts of England"); *see also, e.g.*, *Houston v. Lack*, 487 U.S. 266, 277 (1988) (Scalia, J., dissenting) (referring to "civil actions such as this habeas proceeding"); *McCarthy v. Harper*, 449 U.S. 1309, 1310 (1981) (Rehnquist, J., granting an application for a stay) ("Federal habeas corpus is a civil action . . . ."); *Ellis v. Dyson*, 421 U.S. 426, 440 n.6 (1975) (Powell, J., dissenting) (equating "the scope of collateral attack in habeas corpus proceedings" and "the scope of collateral attack in other federal civil actions").[3]

---

[3] The Court has also repeatedly characterized habeas actions as "civil in nature." *Mayle v. Felix*, 545 U.S. 644, 654 n.4 (2005); *see, e.g.*, *Banister v. Davis*, 590 U.S. 504, 507 (2020).

Justice O'Connor aptly summarized that "[t]he availability and scope of habeas corpus have changed over the writ's long history, but one thing has remained constant: Habeas corpus is … an original civil action." *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 14 (1992) (O'Connor, J., dissenting). The Supreme Court has never once held otherwise.

This Court, too, has repeatedly described habeas actions as civil. *See, e.g.*, *In re Nwanze*, 242 F.3d 521, 526 n.2 (3d Cir. 2001) ("habeas corpus petitions are technically civil actions"); *Parrott v. Gov't of Virgin Islands*, 230 F.3d 615, 620 (3d Cir. 2000) ("Because habeas proceedings are generally considered civil in nature … the term 'civil action' includes habeas petitions"); *Callwood v. Enow*, 230 F.3d 627, 632 (3d Cir. 2000) ("A suit seeking a writ of habeas corpus, although admittedly somewhat of a hybrid, is considered civil in nature."); *Henderson v. Frank*, 155 F.3d 159, 167 (3d Cir. 1998) ("the writ of habeas corpus is a civil proceeding").

**3.** Court rules and procedures likewise characterize habeas actions as civil actions in ways both big and small. For instance, the Federal Rules of Civil Procedure—which "govern the procedure in all civil actions"—govern the procedure for "proceedings for habeas corpus" to the extent that the practice in those proceedings has historically conformed to general civil practice. Fed. R. Civ. P. 1, 81(a)(4). Even a quick look at the record in this case confirms the extent to which habeas actions are considered civil actions. *See, e.g.*, App'x 1 (notice of appeal from

27

"Civil Action No. 3:23-cv-22"); Dkt. 1 ("Civil Case Docketed"); Dkt. 10 ("Civil Information Statement" filed); *see also Lee v. Johnson*, 799 F.2d 31, 36 (3d Cir. 1986) (EAJA applies where both the "action and action upon which it was predicated … were filed and captioned as civil proceedings and were adjudicated pursuant to the Federal Rules of Civil Procedure").

**4.** To be sure, Congress has the tools to *overcome* the plain meaning of "civil action" when context warrants. In *Schlanger v. Seamans*, 401 U.S. 487, 490 n.4 (1971), for example, the Supreme Court acknowledged that "habeas corpus is technically 'civil,'" but observed that the legislative history of the venue provision indicated that Congress intended to exclude habeas from that particular statute.

The Prison Litigation Reform Act, on which the government repeatedly relies, is another example. In reviewing the PLRA's requirement that inmates pay filing fees in "civil actions," this Court recognized that "[h]abeas corpus proceedings are technically civil actions" and thus that, "[a]t first blush, the plain meaning of the PLRA appears to require petitioners for habeas relief to fulfill its filing fee obligations." *Santana v. United States*, 98 F.3d 752, 754 (3d Cir. 1996). But the Court then applied the other tools of statutory interpretation, which *overcame* that meaning. *Id.* at 755. The Court determined, for instance, that construing the PLRA to limit inmates' ability to file habeas petitions—by treating them as "civil actions" requiring payment—"would be contrary to a long tradition of ready access of

28

prisoners to federal habeas corpus." *Id.* at 756 (citation omitted). Ultimately, the PLRA's structure, context, legislative history, purpose, and the holdings of other courts of appeals all showed that "Congress did not intend to include habeas proceedings in the category of 'civil action' *for the purposes of* [*the PLRA*]." *Id.* at 755 (emphasis added). Despite Congress's departure from ordinary meaning "in the PLRA," however, the Court reiterated that "habeas petitions fit within the literal scope of" the phrase "civil action." *Id.* at 754.

*     *     *

Common law, dictionaries, decades of precedent, and court rules all point to the same conclusion: Unless there is clear indicia in a particular statute that Congress meant to deviate from the ordinary meaning of "civil action," that phrase encompasses habeas claims.

**B.     When Congress Uses The Phrase "*Any* Civil Action"—As In EAJA—It Always Encompasses Habeas Actions**

When Congress uses the term "civil action," it presumptively means to include habeas. But EAJA uses stronger language, encompassing "*any* civil action." Even if EAJA's use of "civil action" *alone* would have raised any doubt, Congress removed it by adding "any."

**1.** When a statute uses the phrase "any civil action," it always encompasses habeas. For instance, when Congress authorized district courts to transfer "any civil action," 28 U.S.C. § 1404(a), that authorization included habeas actions, *see*

*Boumediene v. Bush*, 553 U.S. 723, 796 (2008); *see also, e.g.*, *Braden v. 30th Jud. Cir. Ct. of Kentucky*, 410 U.S. 484, 499 n.15 (1973) (Section 1404(a) "of course" applies to habeas petitions); *Nwanze*, 242 F.3d at 526 n.2 (same). When Congress granted defendants the right to remove "any civil action," 28 U.S.C. §§ 1441(a), 1446(a); *see id.* § 1442(a) ("[a] civil action"), that included habeas, *see, e.g.*, *Gillette v. Warden Golden Grove Adult Corr. Facility*, 109 F.4th 145, 150 & n.4 (3d Cir. 2024); *Streicher v. Washington*, 1992 WL 73508, at *3 (D.D.C. Mar. 20, 1992); *Walker v. Williams*, 2019 WL 3307132, at *1 (W.D. Pa. May 21, 2019), *report and recommendation adopted*, 2019 WL 3306731 (W.D. Pa. July 22, 2019). And when Congress granted "original jurisdiction of *all* civil actions arising under the Constitution, laws, or treaties of the United States," it again included habeas. 28 U.S.C. § 1331 (emphasis added); *see, e.g.*, *Bell v. Wolfish*, 441 U.S. 520, 526 n.6 (1979); *Nguyen v. Att'y Gen. of New Jersey*, 832 F.3d 455, 463 (3d Cir. 2016); *German Santos v. Warden Pike Cnty. Corr. Facility*, 965 F.3d 203, 208 (3d Cir. 2020); *United States v. Lilly*, 536 F.3d 190, 195 (3d Cir. 2008); *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 319 (3d Cir. 2020).

In the instances in which Congress intends to omit habeas from "any civil action" or "any civil proceeding," it goes out of its way to exclude habeas expressly. For example, Congress has required "the parties instituting *any civil action*, suit or proceeding in [a district] court … to pay a filing fee of $350, *except* that on

application for a writ of habeas corpus the filing fee shall be $5." 28 U.S.C. § 1914(a) (emphasis added). And in the provision of the PLRA that defines "civil action with respect to prison conditions," Congress wrote that it "means *any* civil proceeding" *except* "habeas corpus proceedings challenging the fact or duration of confinement in prison." 18 U.S.C. § 3626(g) (emphasis added). In other words, when Congress uses the phrase "any civil action" or "any civil proceeding" but does *not* want to include habeas, it signals that intent expressly.

The Supreme Court likewise understands the statutory phrase "all civil actions" to encompass habeas. Consider *Hilborn v. United States*, 163 U.S. 342 (1896), a case that involved a habeas action challenging civil detention. There, Chinese nationals brought habeas corpus suits after they were detained trying to enter the country. *See id.* at 344. California's district attorney defended against the suits, and the court awarded him certain fees for his services. *See id.* The Supreme Court unanimously held the district attorney was required to relinquish those fees to the government because they had been earned as part of "the duties of his office": namely, his statutory responsibility to "prosecute … *all civil actions* in which the United States are concerned." *Id.* at 344-45 (emphasis added) (citations omitted).

Or consider *Reid v. Covert*, 351 U.S. 487 (1957). There, a habeas petitioner prevailed in district court, and the government appealed directly to the Supreme Court under a statute that vested the Court with jurisdiction to hear certain appeals

from "any civil action, suit, or proceeding." *Id.* at 489 (quoting 28 U.S.C. § 1252). The habeas petitioner disputed the Court's jurisdiction, but she did not even attempt to argue that the phrase "any civil action" excluded habeas challenges. Although the Court parsed the statute carefully—and was obligated to dismiss *sua sponte* if the case did not meet each of the jurisdictional elements—it concluded that it "ha[d] jurisdiction" over the matter. *Id.* at 488.

**2.** Congress meant what it said when it wrote "*any* civil action." By placing the word "any" before "civil action," Congress ensured that EAJA applies to civil actions "of whatever kind." *Cazun v. Attorney General*, 856 F.3d 249, at 255 (3d Cir. 2017); *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) (when Congress uses the word "any," it "suggests a broad meaning"); *see* Gregory Sisk, *Litigation With the Federal Government* 549 (2d ed. 2023) ("EAJA adopts the expansive and inclusive term 'any civil action' to broaden its scope."). Cases such as this one—a habeas action challenging civil detention in connection with civil proceedings—are unambiguously a "kind" of civil action.

Indeed, habeas was the *exact* sort of "civil action" Congress was shoring up when it added the word "any." Otherwise, the term would do no work at all. If the phrase "any civil action" included only "garden-variety" civil actions, Br. 25, then it would mean the exact same thing as the phrase "civil action" without the word "any." It is difficult to imagine what other civil actions the word "any" is supposed to pick

up if not habeas. Courts generally strive to avoid construing statutes in a manner that renders any words meaningless. *See Bufkin v. Collins*, 145 S. Ct. 728, 741-42 (2025); *United States, ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 432 (2023). Yet that is the government's view of the word "any."

**3.** Not only did Congress use the most inclusive language imaginable to modify "civil action," it expressly exempted the one category of civil action it meant to exclude—namely, "cases sounding in tort." 28 U.S.C. § 2412(d)(1)(A). One of the cardinal rules of statutory interpretation is that "[w]hen Congress provides exceptions in a statute, … [t]he proper inference … is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth." *United States v. Johnson*, 529 U.S. 53, 58 (2000). That rule applies with extra force when interpreting statutes using the phrase "any civil action," given Congress's penchant for expressly exempting habeas actions from that term when it wants to. *See supra* pp. 30-31. Here, Congress created an exception to the ordinary reach of "any civil action" only for "cases sounding in tort." So the proper inference is that "[i]f Congress had intended to exclude habeas actions from the EAJA, it would have done so as it excluded tort actions." *Kholyavskiy v. Schlecht*, 479 F. Supp. 2d 897, 901 (E.D. Wis. 2007). It did not.

## C.    EAJA's Purpose And History Underscore That It Applies Here

EAJA's statutory purpose further confirms Mr. Michelin's reading.

**1.** EAJA serves three primary purposes: (1) "eliminat[ing] … the financial disincentive to challenge unreasonable governmental action," *Patel v. Att'y Gen. of the United States*, 426 F. App'x 116, 117 (3d Cir. 2011) (quoting *Astrue v. Ratliff*, 560 U.S. 586, 599 (2010) (Sotomayor, J., concurring)); *see also Clarke v. INS*, 904 F.2d 172, 178 (3d Cir. 1990); (2) avoiding the double injustice of "forc[ing]" the victims of arbitrary government action to pay to defend against such action, *see Vacchio*, 404 F.3d at 670; *Ardestani v. INS*, 502 U.S. 129, 138 (1991); and (3) encouraging a "concrete, adversarial test of Government regulation" to "insure[] the legitimacy and fairness of the law," *Comm'r, I.N.S. v. Jean*, 496 U.S. 154, 165 n.14 (1990); *see also Berman v. Schweiker*, 713 F.2d 1290, 1297 (7th Cir. 1983) (similar). Excluding habeas actions challenging civil detention from EAJA would thwart each purpose.

*First*, EAJA facilitates effective challenges to unjustified government detention. For those detained by the government, it is an "obvious truth" that attorneys are often "necessities, not luxuries." *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963); *accord Freza v. Att'y Gen. United States*, 49 F.4th 293, 298 (3d Cir. 2022). That rings especially true in the context of immigration habeas proceedings, where noncitizens must run the gauntlet of unfamiliar rules, clogged-up courts, and proceedings conducted primarily in a language they may not understand—all while detained. Under these circumstances, "[t]he right to be heard would be, in many

cases, of little avail if it did not comprehend the right to be heard by counsel." *Gideon*, 372 U.S. at 344-45 (citation omitted). Statistics bear the point out: Counseled immigrants are more than twice as likely as *pro se* ones to receive a custody hearing, and then nearly *seven* times more likely to be released following that hearing. *See* Ingrid V. Eagly & Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 U. Pa. L. Rev. 1, 70 (2015).

EAJA notably awards attorneys' fees only in narrow circumstances: if (1) the petitioner has "prevail[ed]" against the government; (2) the government's position was not "substantially justified," *and* (3) there are no "special circumstances [that would] make an award unjust." 28 U.S.C. § 2412(d)(1)(A). Counsel understand these restrictions when choosing cases to take on, which means that in this context, EAJA makes the biggest difference for the most vulnerable: those who are unjustifiably detained but who lack the resources to hire counsel to prove as much.

*Second*, EAJA compensates victims of wrongful government action for the costs of defending against such action. This compensation is often modest—the average award is only a few thousand dollars, *see Astrue v. Ratliff*, 560 U.S. 586, 600 (2010) (Sotomayor, J., concurring)—but it can make a substantial impact. Here, such compensation is especially important because "[t]he unjustified detention of an individual is probably the most serious type of unjustified government action, and

the EAJA contemplates that an individual subject to such action should be compensated for having to defend against it." *Kholyavskiy*, 479 F. Supp. 2d at 901.

*Third*, EAJA facilitates challenges to government overreach and thus helps "refin[e] rules and policy." *Ewing*, 826 F.2d at 971. By hitting the government's pocketbook, EAJA deters unauthorized and indefensible overreach. If the government could not be held financially accountable for detaining someone unconstitutionally, however, that would substantially reduce the government's incentives to align its detention policies with the law.

**2.** The history of EAJA and its predecessor statute further confirm its unambiguous meaning. *See Marincas v. Lewis*, 92 F.3d 195, 200-01 (3d Cir. 1996) (listing "legislative history" among the "traditional tools of statutory construction"). That history establishes twice over that Congress—as well as the government itself—understood EAJA to allow attorney's fees in habeas proceedings.

*First*, in crafting EAJA, Congress borrowed the phrase "any civil action" from EAJA's predecessor statute, which Congress passed to put private litigants and the United States on equal footing with respect to the award of court costs. *See supra* pp. 10-13. At the time, costs could generally be awarded *against* unsuccessful habeas petitioners. *See, e.g.*, *Application of Spracher*, 150 F. Supp. 555, 556 (D. Alaska 1957) ("Costs of habeas corpus proceeding may be taxed against the applicant where he is unsuccessful." (citation omitted)); *see also* 25 Am. Jur. *Habeas Corpus* § 160

(1940) ("It is generally held that costs of a habeas corpus proceeding are taxable."). But successful habeas petitioners could not recover costs *from* the government. Habeas proceedings thus exemplified the sort of disparity that Congress and the Department of Justice were trying to address by awarding costs in "any civil action."

*Second*, Congress passed EAJA after the government specifically represented that it would cover "prisoner petitions." In a hearing on the draft bill, the Department of Justice assessed that it would create federal liability for "prisoner petitions." Senate Hearing, *supra*, at 50; *see supra* pp. 14. Both houses of Congress relied on that representation to estimate the law's costs before passing it. *See* S. Rep. No. 96-253, at 12 (1979) (citing the Department's estimate); H.R. Rep. No. 96-1418, at 24 (1980) (same).

Forty-five years later, the government has reversed its position and decided that EAJA should not apply to habeas actions after all. But "the whole point of having written statutes [is that] 'every statute's meaning is fixed at the time of enactment.'" *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024) (quoting *Wis. Cent.*, 585 U.S. at 284). The government's change of heart cannot override EAJA's text, context, purpose, and history, which all show the government had it right the first time. *See* Seth Katsuya Endo, *Fee Retrenchment in Immigration Habeas*, 90 Fordham L. Rev. 1489, 1508-11 (2022).

### D. EAJA Unambiguously Encompasses Habeas Actions

Congress could not have been clearer that EAJA encompasses habeas actions. As discussed, Congress enacted EAJA against a backdrop of common law, dictionary definitions, and dozens of Supreme Court cases providing every indication that "habeas corpus is 'a civil action,'" *Stafford*, 444 U.S. at 543. *See supra* I.A. The government cites no evidence to suggest Congress intended EAJA to depart from that plain, ordinary meaning. In fact, all of the evidence points the other direction. Congress went out of its way to say "*any* civil action," making sure to capture the entire universe of civil proceedings. *See supra* I.B. And to the extent Congress meant to exclude *certain* civil actions from EAJA, it said so expressly, carving out "cases sounding in tort." *See supra* p. 33. But it left habeas in, and for good reason: Habeas actions are the exact type of proceedings EAJA was designed to encompass. *See supra* p. 32-33.

For these reasons, *Santana v. United States* supports Mr. Michelin, not the government. Again, the Court in *Santana* recognized that the "plain meaning" of the phrase "civil action" encompasses habeas. 98 F.3d at 755. Only the considerable body of contrary evidence about the PLRA overcame that rule in the specific statutory context. But EAJA includes habeas for the exact reason the PLRA excludes it: to preserve the "long tradition of ready access of prisoners to federal habeas

corpus." *Id.* The government does not even attempt to argue otherwise in its opening brief. In sum, EAJA unambiguously encompasses habeas actions.

## II. The Government's Counterarguments Fail

The government concedes that "habeas proceedings [are] 'technically civil actions.'" Br. 27 (quoting *Santana*, 98 F.3d at 754-55). Even so, it contends that the words "civil action" lack a plain meaning because, in the abstract, they do not "*invariably* encompass[] habeas proceedings." *Id.* at 21 (emphasis added). Alternatively, the government suggests that habeas actions are not really civil actions at all, but are actually in a "category of their own." *Id.* at 11. Either way, the government says, EAJA is "ambiguous," so the Court should jump straight to the sovereign immunity canon and call it a day.

Every part of this argument is wrong. *First*, the government ignores that the sovereign immunity canon kicks in only if a statutory phrase remains ambiguous *after* the court exhausts the traditional tools of statutory interpretation. *Second*, the government overlooks that "civil action" *has* a plain meaning that *includes* habeas, so the phrase would be ambiguous only if EAJA evinced congressional intent to *depart* from its ordinary scope. Yet EAJA not only lacks such indicia, it contains overwhelming evidence that Congress meant to capture habeas actions. *Third*, the government's claim that habeas actions are a "category of their own" contradicts Supreme Court precedent and numerous federal statutes that say "civil action" and

39

indisputably include habeas. *Finally* the government erroneously places substantial stock in a single line of unreasoned dicta in an unpublished decision from an unargued *pro se* appeal. The Court should reject the government's arguments.

### A. The Government's Sovereign Immunity Argument is Meritless Because EAJA Unambiguously Encompasses Habeas Actions

#### 1. The Sovereign Immunity Canon Applies At the End, Not the Beginning, of the Interpretive Process

The government's reliance on the sovereign immunity canon is misplaced because courts must exhaust the traditional tools of statutory interpretation before that canon comes into play. And after exhausting all the traditional tools, there is no doubt that EAJA encompasses habeas actions.

The government gets the sovereign immunity canon wrong from the start. Contrary to the government's characterization, the sovereign immunity canon is no more than a "rule[] of thumb" that helps courts discern the meaning of ambiguous statutory language after the traditional tools of statutory interpretation fail. *Sebelius v. Cloer*, 569 U.S. 369, 381 (2013) (citation omitted). As the Supreme Court has emphasized, the canon does not "require[] that Congress use magic words" or "state its intent in any particular way." *FAA v. Cooper*, 566 U.S. 284, 291 (2012). Rather, "[t]he sovereign immunity canon is just that—a canon of construction." *Richlin Sec. Serv. Co. v. Chertoff*, 553 U.S. 571, 589 (2008). "It is a tool for interpreting the law," and it does not "displace[] the other traditional tools of statutory construction." *Id.*

Just the opposite: Courts "resort" to the canon only if, "after a close reading of the [relevant] statutory provision," "there is [still] ambiguity left for [courts] to construe." *Id.* at 589-90.

Courts are especially reluctant to apply the canon when Congress has "waive[d] the Government's immunity from suit in sweeping language." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 492 (2006) (citation omitted). In that situation, it is "unhelpful" to apply the canon because doing so would undermine "the central purpose of the statute": permitting suit against the government. *Id.* at 491-92 (citation omitted); *see Kosak v. United States*, 465 U.S. 848, 854 n.9 (1984); *see also United States v. Idaho ex rel. Dir., Idaho Dep't of Water Res.*, 508 U.S. 1, 7 (1993) ("[J]ust as we should not take it upon ourselves to extend the waiver beyond that which Congress intended, neither, however, should we assume the authority to narrow the waiver that Congress intended." (cleaned up)).[4]

---

[4] For those reasons, it is rare for the canon to do any work when courts are interpreting the *scope*—rather than the *existence*—of a waiver of immunity. "[W]hether Congress has waived the defense" of sovereign immunity is a conceptually "separate question[]" from "the scope of the Government's waiver." 14 Wright & Miller, *supra*, § 3654. Courts generally find the *existence* of "a clear waiver of sovereign immunity in only two situations," *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 49 (2024) (citation and quotation marks omitted), but courts typically determine the *scope* of a waiver using the "traditional tools of statutory construction" without "resort[ing] to the sovereign immunity canon," *Richlin*, 553 U.S. at 590; *see, e.g.*, *Cloer*, 569 U.S. at 381-82; *see also* Antonin Scalia & Bryan A. Garner, *Reading Law* 285 (2012); Gregory C. Sisk,

That makes sense: "The very point of the traditional tools of statutory construction—the tools courts use every day—is to *resolve* statutory ambiguities." *Loper Bright*, 603 U.S. at 401 (emphasis added). So "before concluding that a [provision] is genuinely ambiguous, a court must exhaust *all* the 'traditional tools' of construction." *Kisor v. Wilkie*, 588 U.S. 558, 575 (2019) (emphasis added) (citation omitted). "[O]nly when that legal toolkit is empty and the interpretive question still has no single right answer can a judge" find ambiguity, *id.*, and apply the sovereign immunity canon as a tie-breaker.

One especially instructive illustration of the point comes from *Richlin Security Services v. Chertoff*, 553 U.S. 571 (2008), which also involved EAJA. The Court there found "no need … to resort to the sovereign immunity canon" before holding that EAJA waives sovereign immunity for the recovery of paralegal fees at market rates. *Id.* at 590. Even "[t]o the extent that some ambiguity subsist[ed] in the statutory text" initially, *id.* at 580, the Court resolved that ambiguity by reviewing precedent and using "other traditional tools of statutory construction," after which "there [was] no ambiguity left," *id.* at 589-90. The Court thus rejected the government's argument that "any right to recover paralegal fees under EAJA must

---

*Twilight for the Strict Construction of Waivers of Federal Sovereign Immunity*, 92 N.C. L. Rev. 1245 (2014).

be read narrowly in light of the statutory canon requiring strict construction of waivers of sovereign immunity." *Id.* at 589.

Here, the government says the Court "may" apply "traditional interpretive tools" before resorting to the sovereign immunity canon, Br. 18, but it then treats the canon as a shortcut around those tools. After arguing that "the term 'civil action' can be reasonably read in at least two ways," the government stops its statutory analysis, declares the phrase "ambiguous," and insists that the Court give up and resort to the canon. *Id.* at 25. But even if the words "any civil action" were facially susceptible to two possible readings, that would merely be the *start* of this Court's analysis, not the end. *See United States v. Rutherford*, 120 F.4th 360, 380 n.28 (3d Cir. 2024) ("[A]n ambiguity determination comes only after courts apply traditional tools of statutory construction."). And as discussed, all of the traditional interpretive tools support Mr. Michelin.

### 2.     There Is No Ambiguity In EAJA

The government offers no reason to think EAJA is the one federal statute that implicitly *excludes* habeas from the phrase "any civil action." Instead, the government wrenches the words "civil action" out of the statute and claims that, in the abstract, they can be "read in at least two ways." Br. 25.

But even under the government's conception of the sovereign immunity canon, courts do not determine whether statutory language is ambiguous in the

43

abstract. Courts "cannot rely on any all-purpose definition but must consider the particular context in which [a] term appears." *FAA v. Cooper*, 566 U.S. 284, 294, 300 (2012) (explaining statutory term "takes on different meanings in different contexts") (cited in Br. 1, 11, 16, 17, 28, 30, 32). "[T]he meaning of statutory language, plain or not, depends on context." *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991).

"Ambiguity," in turn, "is a creature not of definitional possibilities but of statutory context." *Brown v. Gardner*, 513 U.S. 115, 118 (1994). "[O]ftentimes the 'meaning—or ambiguity—of certain words or phrases may only become evident when placed in context.'" *King v. Burwell*, 576 U.S. 473, 486 (2015). Just as an ostensibly clear term can become ambiguous in context, *see id.* at 500 (holding that, in the context of a particular statute, "established by the State" could mean *not* established by a State), statutory context can clarify an ostensibly ambiguous term, *see Brown*, 513 U.S. at 117-18.

As discussed, there is overwhelming evidence that the phrase "civil action" includes habeas and that Congress meant it that way in EAJA. At the very least, though, there is no evidence whatsoever that EAJA uses "civil action" to encompass a *narrower* field than the phrase ordinarily captures.[5] To the contrary, EAJA applies

---

[5] The government admits that "courts 'normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent,'" Br. 22 (citation omitted), but it

to "*any* civil action," a statutory phrase that *always* includes habeas. *See supra* I.B. And the government has no answer to the basic rule of statutory interpretation that when Congress inserts exceptions into a statute—as it did in EAJA for "cases sounding in tort"—courts are not permitted to insert additional ones. *See United States v. Smith*, 499 U.S. 160, 167 (1991).

The government also has no argument as to how its interpretation advances or is even consistent with EAJA's purpose. *See supra* I.C. The government instead urges the Court to ignore this traditional tool of statutory interpretation. *See* Br. 38. But the Supreme Court has held that EAJA must be "read in light of its purpose to diminish the deterrent effect of seeking review of, or defending against, governmental action." *Sullivan v. Hudson*, 490 U.S. 877, 890 (1989); *see, e.g.*, *Richlin*, 553 U.S. at 583, 587-89 (considering EAJA's purpose in interpreting its terms); *Jean*, 496 U.S. at 163 (same). This Court likewise considers EAJA's purpose

---

fails to understand why that further undermines its case. Contrary to the government's apparent assumption, Congress did *not* introduce the phrase "any civil action" in 1980; instead, Congress first used the phrase in EAJA's predecessor in 1966. Every "relevant judicial precedent" at that time made clear that "civil actions" included habeas actions challenging civil detention; the government cites not a single case or other authority that would have led Congress in 1966 to conclude otherwise. Even if 1980 were somehow the relevant date, though, the same conclusion holds: Just before EAJA's passage, the Supreme Court affirmed that "[i]t is well settled that habeas corpus is a civil proceeding," *Browder*, 434 U.S. at 269; just after, the Court reaffirmed that "[o]ur decisions have consistently recognized that habeas corpus proceedings are civil in nature," *Hilton*, 481 U.S. at 776.

when interpreting it. *See, e.g.*, *Handron v. HHS*, 677 F.3d 144, 153 (3d Cir. 2012). And although the government's own favored cases—*Schlanger* and *Santana*—relied on legislative history as a factor in excluding habeas from the statutes at issue, *Schlanger*, 401 U.S. at 490 n.4.; *Santana*, 98 F.3d at 755, the government draws no support from EAJA's history, which overwhelming supports Mr. Michelin, *see supra* I.C. Instead, the government disavows this traditional tool of statutory construction as well. Br. 11-12. *See Marincas*, 92 F.3d at 200-01 (3d Cir. 1996) (listing "legislative history" among the "traditional tools of statutory construction").[6]

Short of inserting exactly the sort of "magic words" that the sovereign immunity canon does not require, the government never explains how Congress could possibly have made EAJA's scope clearer. That is for good reason: Every tool of statutory construction establishes that EAJA includes habeas actions challenging civil detention.

---

[6] Contrary to the government's view, neither *Department of Agriculture Rural Development Rural Housing Service v. Kirtz*, 601 U.S. 42, 49 (2024), nor *FAA v. Cooper*, 566 U.S. 284, 291 (2012), holds otherwise. *Kirtz* concerned the existence of a waiver of immunity. 601 U.S. at 49. *Cooper* likewise referred to the no-legislative-history principle in the context of discerning the existence of a waiver; it did not purport to extend the principle to questions "concern[ing] the *scope* of that waiver," instead reaffirming the rule that courts should interpret "the statutory text in light of traditional interpretive tools." 566 U.S. at 291. It is especially unlikely that *Cooper* sought to *sub silentio* overrule previous decisions like *Richlin* when *Cooper* was penned by none other than the author of *Richlin* himself.

**B.    The Government's Effort to Reclassify Habeas Actions As Presumptively Not Civil Actions Is Meritless**

The government contends that EAJA is ambiguous as to habeas actions for two reasons. *First*, citing cases holding that the term "civil action" does not encompass habeas actions in particular statutes, the government extrapolates that the term "civil action" lacks a plain meaning in general. *Second*, the government argues that habeas actions are not actually civil actions at all, but instead "unique, hybrid actions in a category of their own." Br. 11. But these arguments only underscore that EAJA encompasses Mr. Michelin's habeas claims.

**1.** As an initial matter, the statutory term "civil action" has a plain meaning, and it includes habeas actions. *See supra* I.A. For all its talk of habeas as "unique" and "hybrid," the government cannot escape the simple fact that "habeas proceedings [are] 'technically civil actions.'" Br. 27 (quoting *Santana*, 98 F.3d at 754-55). Even in the rare cases where courts have excluded habeas from the phrase "civil action" *in a particular statutory context*, they consistently acknowledge that "habeas corpus is technically 'civil,'" *Schlanger*, 401 U.S. at 490 n.4, and that "habeas corpus proceedings are characterized as 'civil,'" *Harris v. Nelson*, 394 U.S. 286, 293 (1969). In *Santana*, for example, the Court concluded that that "habeas petitions are not 'civil actions' *for purposes of the Prison Litigation Reform Act*," only after acknowledging that habeas actions are "technically civil actions." Br. 27 (quoting *Santana*, 98 F.3d at 754-55) (emphasis added). So while the government

notes that a particular statute using the "phrase 'civil action'" does not "*invariably* encompass[] habeas proceedings," *id.* at 21 (emphasis added), it cannot escape the "one thing has remained constant: Habeas corpus is … an original civil action." *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 14 (1992) (O'Connor, J., dissenting). Whatever a particular statute does with the phrase, "[h]abeas corpus proceedings are technically civil actions." *Santana*, 98 F.3d at 754.

This matters, because EAJA expressly encompasses "*any* civil action." That includes proceedings that are "*technically* 'civil,'" even if "not subject to all the rules," *Schlanger*, 401 U.S. at 490 n.4 (emphases added), or that are "*technically* civil actions" notwithstanding some "hybrid" features, *Santana*, 98 F.3d at 754 (emphasis added); *see Callwood*, 230 F.3d at 632 ("A suit seeking a writ of habeas corpus, although admittedly somewhat of a hybrid, is considered civil in nature."). Again, that is what the word "any" does. *See supra* I.B. Even if the government were right that habeas proceedings are not "*garden-variety* civil actions," Br. 25 (emphasis added), a statute that covers "any"—that is, *every*—civil action is not limited to the garden variety. So whether habeas is (1) a "garden variety civil action" or (2) only "technically" a civil action despite "hybrid" features, there are not "two ways" to read "*any* civil action" in EAJA. *See, e.g.*, *Nwanze*, 242 F.3d at 526 n.2 (citing *Schlanger* and concluding that a statute using "any civil action" "applies to

… habeas corpus petitions, as habeas corpus petitions are technically civil actions" (cleaned up)).[7]

**2.** Perhaps recognizing this, the government takes its argument a step further and claims that habeas is not a "civil action" at all, but actually "a category unto itself." Br. 30; *see id.* at 11 ("category of their own"). The government derives this position from two recent cases out of the Fourth and Fifth Circuits, *Obando-Segura v. Garland*, 999 F.3d 190 (4th Cir. 2021), and *Barco v. Witte*, 65 F.4th 782 (5th Cir. 2023). *See* Br. 29.

Again, however, every Supreme Court case has held that habeas actions are at least "technically" civil. And the Court has said dozens of times that "[h]abeas proceedings, for those new to the area, are *civil in nature.*" *See Banister v. Davis*, 590 U.S. 504, 507 (2020) (emphasis added); *see supra* I.A.

The holdings in *Obando-Segura* and *Barco* are especially extraordinary because neither one even suggested that EAJA contains any indicia of intent to *exclude* habeas—unlike the venue statute at issue in *Schlanger*, and the PLRA, *see Santana*, 98 F.3d at 754-55. *Obando-Segura* and *Barco* both said what the

---

[7] The government posits that the phrase "civil action" can "be read narrowly to include only those cases that are wholly or purely civil in nature." Br. 25. The government cites nothing in support of that narrower definition. But that scarcely matters, because even that definition indisputably encompasses this case: a habeas action (which, "for those new to the area, [is] *civil in nature,*" *Banister v. Davis*, 590 U.S. 504, 507 (2020) (emphasis added)), challenging *civil* detention in connection with *civil* immigration proceedings.

government parrots now: that EAJA does not apply to habeas because habeas actions are not *really* civil actions at all.[8]

But that cannot be true. As discussed, numerous statutes that use the phrase "civil action" indisputably encompass habeas. *See supra* I.B; *see also, e.g.*, 28 U.S.C. § 1331 (giving district courts jurisdiction to hear "civil actions arising under the Constitution, laws, or treaties of the United States"); 28 U.S.C. § 1404(a) (allowing courts to transfer "any civil action"); 28 U.S.C. §§ 1441(a), 1442(a), 1446(a) (right to remove "any civil action"). If habeas were "a category unto itself," and not a "civil action," it would not be subject to those provisions. But even the government does not go that far. *See* Br. 25-26.

The government observes that habeas does not follow all of the "civil personal jurisdiction and venue rules," that "[t]he petitioner is not entitled to discovery, and factual development lies within the court's discretion." *Id.* at 23-24. But that

---

[8] The litigants in *Obando-Segura* were constrained in their arguments by circuit precedent that had already held that habeas actions seeking to challenge criminal detention were partially criminal. Thus the litigants were constrained to argue that "civil" habeas challenges are properly characterized as civil even if "criminal" habeas challenges are not. This Court can adopt that line, which is the line used by the Second Circuit. *See Vacchio*, 404 F.3d at 668-72. Or the Court can simply hold that the EAJA applies to habeas actions because habeas actions are civil actions and the statute applies to "any civil action." *See Obando-Segura*, 999 F.3d at 196 (explaining that "whatever we think of the possibility that the term 'any' can sufficiently disambiguate the term 'civil action,' that argument cannot survive [our precedent].").

argument makes no sense conceptually. Courts categorize proceedings as "civil" or "criminal" based on the type of right being enforced. *See Ex parte Tom Tong*, 108 U.S. at 559; *see also Lee*, 799 F.3d at 36. Even in the heyday of the specialized writ system—when each writ corresponded to a different form of action with its own, unique set of procedures—courts treated all cases brought to enforce civil rights as civil actions. *See supra* pp. 5-8. Habeas actions have some special rules and enforce special rights, but a habeas action does not stop being a civil action for that reason.

EAJA itself shifts fees in civil actions that look far stranger than any habeas action. Consider the U.S. Court of Appeals for Veterans Claims: EAJA expressly applies to civil actions in that Article I tribunal, *see* 28 U.S.C. § 2412(d)(1)(A) (awarding fees in "any civil action" brought "in any court"), (d)(2)(F) (defining "court" to include "the United States Court of Appeals for Veterans Claims"), even though "[t]he contrast between ordinary civil litigation … and the system that Congress created for the adjudication of veterans' benefits claims could hardly be more dramatic," *Henderson v. Shinseki*, 562 U.S. 428, 440 (2011). Courts at least apply the Federal Rules of Civil Procedure in habeas actions to *some* extent; cases before the Veterans Court, by contrast, are governed by entirely *sui generis* rules. *See* U.S. Court of Appeals for Veterans Claims, Rules of Practice and Procedure (July 16, 2024), https://www.uscourts.cavc.gov/rules_of_practice.php. An action's

status as a "civil action" simply does not turn on the degree to which it looks like or differs from an "ordinary" civil case.

## C. The Government's Reliance on *Daley v. Federal Bureau of Prisons* Is Misplaced

Finally, the government's extensive reliance on one line of dicta in *Daley v. Federal Bureau of Prisons*, 199 F. App'x 119 (3d Cir. 2006) (discussed at Br. 5, 9, 25-26, 28, 30-31, 34), an unpublished decision from a panel of this Court, is misplaced. In *Daley*, the panel rejected a *pro se* litigant's attempt, after his criminal habeas proceeding, to obtain fees under 18 U.S.C. § 3006A, the "provision by which court-appointed attorneys are provided." *Id.* at 120-21. The panel explained that "Daley is not an attorney, and obviously, was not appointed to represent himself." *Id.* at 121.

In passing, the panel also rejected Daley's statement (made "without argument") that he could obtain fees under EAJA. As with Section 3006A, the panel emphasized that "a *pro se* litigant is not eligible to recover attorney's fees under the EAJA." *Id.* at 121. The panel noted (in one sentence without analysis) that "[t]hree of our sister circuits have concluded that filing a § 2241 petition is not a 'civil action' for purposes of EAJA." *Id.* (citing *O'Brien v. Moore*, 395 F.3d 499 (4th Cir. 2005); *Ewing v. Rodgers*, 826 F.2d 967 (10th Cir. 1987); and *Boudin v. Thomas*, 732 F.2d 1107 (2d Cir. 1984)).

One line of dicta from the unpublished decision in *Daley*, in response to a statement by a *pro se* litigant without argument, is hardly the type of "prior decision" the Court should blindly "follow[]." Br. 25, 30. Indeed, in the years since *Daley*, this Court and district courts in this Circuit continue to adjudicate the merits of fee awards under EAJA in habeas actions, *see, e.g.*, *Kiareldeen v. Ashcroft*, 273 F.3d 542, 557 (3d Cir. 2001), and the government even accedes to fee awards in such cases, *see, e.g.*, *German Santos v. Warden Pike Cnty. Corr. Facility*, No. 19-2663, Dkt. 98 (3d Cir. Feb. 19, 2021).

But even to the extent *Daley* provides any guidance, its deference to *Boudin*, *Ewing*, and *O'Brien* actually supports Mr. Michelin. "*Boudin's* holding—that the EAJA term 'civil actions' does not apply to habeas petitions—is limited to *criminal* habeas petitions," and "*Boudin* does not apply to habeas petitions challenging immigration proceedings." *Vacchio*, 404 F.3d at 668-69 (emphasis in original). *Ewing* likewise distinguished "habeas actions challenging confinement based on a criminal judgment," 826 F.2d at 970 n.3, from "habeas action[s] by an alien seeking admission to the United States," *id.* at 971 n.5. And *O'Brien* held that habeas cases challenging *criminal* detention are exempt from EAJA because such cases "necessarily assume[] part of the underlying case's *criminal* nature." 395 F.3d at 505 (emphasis added). Here, Mr. Michelin challenged his *civil* detention in connection with *civil* removal proceedings—in a "civil action."

* * *

When Congress uses the phrase "any civil action," it covers habeas actions. That follows from the plain meaning of "civil action," from Congress's consistent usage, from the Supreme Court's repeated holdings, from ordinary canons of statutory interpretation—including the canon against surplusage and the explicit exceptions canon—and from EAJA's purposes. Against all of that evidence, the government has its bare assertion that the term "civil action" must be ambiguous because some specific statutes depart from the plain meaning of the phrase, and because in the government's view habeas actions are not really civil actions. The Court should follow Congress's unequivocal mandate in EAJA and hold that fees are plainly available in habeas actions.

## CONCLUSION

This Court should affirm the decision below.

Dated: April 30, 2025

Margaret Kopel
Jonah Eaton
NATIONALITIES SERVICE CENTER
1216 Arch St, 4th Floor
Philadelphia, PA 19107

William T. Sharon
Nicole L. Masiello
ARNOLD & PORTER
  KAYE SCHOLER LLP
255 West 55th Street
New York, NY 10019

Respectfully submitted,

/s/ Andrew Tutt
R. Stanton Jones
Andrew T. Tutt
Casey Corcoran
Katie Weng
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
andrew.tutt@arnoldporter.com

*Counsel for Petitioner-Appellee Adolph Michelin*

**CERTIFICATE OF BAR MEMBERSHIP**

I hereby certify that I am a member of the Bar of this Court.


Dated: April 30, 2025         */s/ Andrew Tutt*
                                              Andrew T. Tutt

## CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2025, I electronically filed the foregoing document and accompanying materials with the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Dated: April 30, 2025
/s/ Andrew Tutt
Andrew T. Tutt

**CERTIFICATE OF COMPLIANCE**

1.     The foregoing brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7) because the brief contains 12,945 words.

2.     The brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 in Times New Roman 14-point font.

3.     In accordance with Third Circuit Local Appellate Rule 31.1(c), the text of Appellee's Brief, as electronically filed on April 30, 2025, is identical to the text of the Brief to be submitted in paper copy.

4.     In accordance with Third Circuit Local Appellate Rule 31.1(c), Appellee's Brief, as electronically filed on April 30, 2025, was scanned with a virus detection program, namely Microsoft Defender (Version 1.399.35.0), and no virus was detected.

Dated: April 30, 2025          */s/ Andrew Tutt*_____
                              Andrew T. Tutt