Nos. 24-2990, 24-3198

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

ADOLPH MICHELIN,

    *Petitioner-Appellee*,

v.

WARDEN MOSHANNON VALLEY PROCESSING CENTER,
et al.,

    *Respondents-Appellants*.

ADEWUMI ABIOYE,

    *Petitioner-Appellee*,

v.

WARDEN MOSHANNON VALLEY PROCESSING CENTER,
et al.,

    *Respondents-Appellants*.

On Appeal from the United States District Court
for the Western District of Pennsylvania

**BRIEF OF HABEAS AND IMMIGRATION LAW SCHOLARS
AS *AMICI CURIAE* IN SUPPORT OF APPELLEES**

Matt Gregory
Hayley N. Lawrence
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
hlawrence@gibsondunn.com

*Counsel for Amici Curiae*

**TABLE OF CONTENTS**

Page

INTEREST OF *AMICI CURIAE* ...................................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .........................................2

ARGUMENT ..............................................................................................................2

I. Historical practice makes clear that habeas proceedings are civil actions. ..................................................................................................................2

   A. The modern habeas writ originated from civil proceedings. .........................3

   B. The U.S. Supreme Court has repeatedly affirmed that habeas proceedings are civil actions. ...................................................................7

II. This Court should join the Second and Ninth Circuits in holding that habeas proceedings are "civil" and not "hybrid" actions. ...............................10

CONCLUSION ........................................................................................................12

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Banister v. Davis*,
  590 U.S. 504 (2020) ............................................................................................. 9

*Browder v. Dir., Dep't of Corr. of Ill.*,
  434 U.S. 257 (1978) ............................................................................................. 9

*Brown v. Vasquez*,
  952 F.2d 1164 (9th Cir. 1991) ............................................................................. 9

*Cross v. Burke*,
  146 U.S. 82 (1892) ............................................................................................... 9

*Farnsworth v. Montana*,
  129 U.S. 104 (1889) ............................................................................................. 9

*Gomez Barco v. Witte*,
  65 F.4th 782 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 553 (2024) .................... 11

*Hilton v. Braunskill*,
  481 U.S. 770 (1987) ........................................................................................ 2, 10

*INS v. Lopez-Mendoza*,
  468 U.S. 1032 (1984) ......................................................................................... 12

*INS v. St. Cyr*,
  533 U.S. 289 (2001) ............................................................................................. 5

*Kurtz v. Moffitt*,
  115 U.S. 487 (1885) ............................................................................................. 8

*O'Brien v. Moore*,
  395 F.3d 499 (4th Cir. 2005) ............................................................................. 11

*Obando-Segura v. Garland*,
  999 F.3d 190 (4th Cir. 2021) ............................................................................. 11

*Palma v. ATF*,
  228 F.3d 323 (3d Cir. 2000) ................................................................................ 3

*In re Petition of Hill*,
  775 F.2d 1037 (9th Cir. 1985) ..................................................................... 10, 12

*Ex parte Randolph*,
  20 F. Cas. 242 (C.C.D. Va. 1833) ....................................................................... 6

*Riddle v. Dyche*,
  262 U.S. 333 (1923) ............................................................................................. 7

# TABLE OF AUTHORITIES
# (continued)

Page(s)

*Santana v. United States*,
 98 F.3d 752 (3d Cir. 1996) ............................................................................... 11

*Schlanger v. Seamans*,
 401 U.S. 487 (1971) ........................................................................................... 9

*Ex parte Tom Tong*,
 108 U.S. 556 (1883) ....................................................................................... 7, 8

*United States v. Cole*,
 101 F.3d 1076 (5th Cir. 1996) ......................................................................... 11

*United States v. Green*,
 26 F. Cas. 30 (C.C.D.R.I. 1824) ........................................................................ 6

*United States v. Thomas*,
 713 F.3d 165 (3d Cir. 2013) ............................................................................ 10

*Vacchio v. Ashcroft*,
 404 F.3d 663 (2d Cir. 2005) ................................................................. 10, 11, 12

*Zadvydas v. Davis*,
 533 U.S. 678 (2001) ......................................................................................... 12

## Statutes

8 U.S.C. § 1302 (1976) .......................................................................................... 12

8 U.S.C. § 1306 (1976) .......................................................................................... 12

8 U.S.C. § 1325 (1976) .......................................................................................... 12

28 U.S.C. § 1608 ...................................................................................................... 9

28 U.S.C. § 2412(d)(1)(A) ....................................................................................... 2

31 U.S.C. § 3730(b) ................................................................................................. 9

## Other Authorities

Amanda L. Tyler, *Habeas Corpus and the American Revolution*, 103
 Calif. L. Rev. 635 (2015) ................................................................................... 5

Brian Farrell, *From Westminster to the World: The Right to Habeas
 Corpus in International Constitutional Law*, 17 Mich. St. J. Int'l L.
 551 (2008) .......................................................................................................... 4

Charles Alan Wright, *Habeas Corpus: Its History and Its Future*, 81
 Mich. L. Rev. 802 (1983) ................................................................................... 7

Donald E. Wilkes, Jr., *From Oglethorpe to the Overthrow of the Confederacy: Habeas Corpus in Georgia, 1733-1865*, 45 Ga. L. Rev. 1015 (2011) ............................................................................................. 6

H.R. Rep. No. 91-1546 (1970) ............................................................................ 7

Jonathan L. Hafetz, *The Untold Story of Noncriminal Habeas Corpus and the 1996 Immigration Acts*, 107 Yale L.J. 2509 (1998) ................................. 6

Katherine A. MacFarlane, *Adversarial No More: How Sua Sponte Assertion of Affirmative Defenses to Habeas Wreaks Havoc on the Rules of Civil Procedure*, 91 Or. L. Rev. 177 (2012) ............................................ 7

Katherine A. MacFarlane, *Shadow Judges: Staff Attorney Adjudication of Prisoner Claims*, 95 Or. L. Rev. 97 (2016) ................................. 7

Katherine Macfarlane, *Prisoner Procedure*, in A Guide to Civil Procedure 6 (Brooke Coleman et al. eds., 2022) ..................................................... 8

Marc D. Falkoff, *Back to Basics: Habeas Corpus Procedures and Long-Term Executive Detention*, 86 Denv. U. L. Rev. 961 (2009) ................... 4, 5

Maxwell Cohen, *Habeas Corpus Cum Causa-The Emergence of the Modern Writ*, 18 Canadian Bar Rev. 10 (1940) ............................................... 3

Neil Douglas McFeeley, *The Historical Development of Habeas Corpus*, 30 Sw. L.J. 585 (1976) ............................................................................ 3

Paul D. Halliday, *Habeas Corpus from England to Empire* (2012) ..................... 5

2 William Blackstone, *Commentaries* ................................................................. 3

### Constitutional Provisions

U.S. Const. art. I, § 9, cl. 2 ................................................................................. 5

# INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are legal scholars who research, write, and teach about habeas corpus, federal litigation, immigration law, and civil rights. They have substantial expertise in the history of the habeas writ, immigration proceedings, attorneys' fees, and related matters, and have written extensively on these subjects. *Amici* have a professional and scholarly interest in the proper disposition of those issues and submit this brief to assist the Court in resolving this case based on a complete and accurate understanding of the historical record.

Tania N. Valdez is an Associate Professor of Law at the George Washington University Law School. Professor Valdez's research and teaching focus on immigration law, including litigation of immigration-related issues in federal courts. Her scholarship has been published by the Notre Dame Law Review, the Washington University Law Review, and the Boston College Law Review, among others.

Additional signatories are listed in an appendix to this brief.[2]

---

[1] No counsel for a party authored this brief in whole or in part, and no person made a monetary contribution to the brief's preparation or submission. Counsel for all parties have consented to the filing of this brief.

[2] *Amici* join this brief in their individual capacities. University affiliation is listed for identification purposes only.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Longstanding practice establishes that habeas corpus proceedings are civil actions. Moreover, the habeas proceeding also serves the distinct purpose of vindicating civil rights—namely, the freedom from unlawful detention. So, although the writ's contours have changed over time, the Supreme Court has "consistently recognized that habeas corpus proceedings are civil in nature." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). Against that backdrop, Congress enacted the Equal Access to Justice Act ("EAJA" or "the Act") and provided that a prevailing party in "any civil action" brought against the United States may recover attorneys' fees. 28 U.S.C. § 2412(d)(1)(A).

Despite that history, the question in this appeal is whether a habeas action brought to challenge detention during immigration proceedings qualifies as a "civil action" within the meaning of the EAJA. The historical record confirms that it is, as the district court correctly held below. This Court should affirm.

**ARGUMENT**

**I. Historical practice makes clear that habeas proceedings are civil actions.**

For nearly all of U.S. history, habeas proceedings have been available to detainees to challenge their detention by the government to protect a fundamental civil right: freedom from unlawful detention. The Supreme Court, this Court, and other courts applying the common law writ have understood habeas proceedings—

particularly those challenging non-criminal forms of detention—as civil in nature. *See, e.g.*, *Palma v. ATF*, 228 F.3d 323, 327 (3d Cir. 2000) (noting that "a petition for a writ of habeas corpus is an independent civil action even though the detention complained of arises out of a criminal action"). The habeas writ and associated proceedings are, and have always been understood as, distinct from the underlying action that gave rise to the habeas suit.

## A. The modern habeas writ originated from civil proceedings.

Though the exact genesis of the habeas writ has not been determined, scholars of legal history agree that in "the early stages" of the writ's development, habeas corpus "was 'merely procedural' and an interlocutory mandate ordered ***during civil proceedings***" to "have the body" in medieval England. Neil Douglas McFeeley, *The Historical Development of Habeas Corpus*, 30 Sw. L.J. 585, 586 (1976) (quoting 2 William Blackstone, *Commentaries* *131) (emphasis added). As early as the 12th Century, the writ was part of the "*mesne* process in ordinary ***civil pleas***." Maxwell Cohen, *Habeas Corpus Cum Causa—The Emergence of the Modern Writ*, 18 Canadian Bar Rev. 10, 10 (1940) (emphasis added). In these early stages, courts used the writ to compel someone to appear before the tribunal, commonly for those in government custody.

Beginning in the "mid-fourteenth century[,] cases reveal instances of the writ of habeas corpus being issued *upon petition of a defendant* who has been imprisoned

while awaiting trial in private actions," rather than by the court *sua sponte*. Farrell, *supra*, at 553 (emphasis added). Practically speaking, this allowed courts to "inquire into the cause and legitimacy of imprisonment ordered by a lower court," as "centralized courts [sought] to divest older local courts of jurisdiction." *Id.* As the writ of habeas gained popularity, courts sometimes used it to further these judicial power struggles (grabbing jurisdiction from other courts, for, among other reasons, the revenue). *Id.* at 553–54.

In response to these feuds, Parliament enacted a series of laws meant to curb the use of habeas, but they did not work, and the writ evolved into something resembling what we know today: "a vehicle to test the legality of imprisonment." Farrell, *supra*, at 554. During the 16th and 17th Centuries, "Parliament attempted to strengthen habeas corpus and limit the crown's power to imprison." *Id.* at 555. "The Habeas Corpus Act of 1640 provided that any person imprisoned by authority of the crown could be granted a writ of habeas corpus upon petition to the courts." *Id.* Following the English Civil War, Parliament enacted the Habeas Corpus Act of 1679, which permanently enshrined habeas corpus as an essential tenet of British constitutional law.

The writ was imported to colonial America. Even before the American Revolution, habeas corpus was available to British subjects and non-enemy foreigners in the colonies. Marc D. Falkoff, *Back to Basics: Habeas Corpus*

*Procedures and Long-Term Executive Detention*, 86 Denv. U. L. Rev. 961, 978 (2009). During the Revolutionary War, the colonists developed a particular appreciation for the writ of habeas corpus when they witnessed the suspension of the writ in England and the resulting long-term detention of Americans there. Amanda L. Tyler, *Habeas Corpus and the American Revolution*, 103 Calif. L. Rev. 635, 647 (2015).

By the time the Framers drafted the Constitution, the importance of the writ was widely accepted and the subject of little debate, and access to the writ was enshrined into Article I. Falkoff, *supra*, at 981; *see* U.S. Const. art. I, § 9, cl. 2. In the Judiciary Act of 1789, Ch. 20, § 14, 1 Stat. 73, 81–82, the First Congress then ensured that the federal courts had jurisdiction over habeas actions, and the writ has been a fundamental component of our judicial system ever since.

The writ has long enabled petitioners to "challenge Executive and private detention in civil cases," in addition to detentions arising from criminal cases. *INS v. St. Cyr*, 533 U.S. 289, 301–02 (2001). Well before the Founding, the writ of habeas corpus was available to people confined for *non-criminal* reasons. Paul D. Halliday, *Habeas Corpus from England to Empire* 32–33 (2012) (detailing 17th and 18th Century use of writ in cases addressing "prisoners of war," "family custody disputes," "naval impressment," and other "detentions that contained no element of

wrong in them"); *see also* Jonathan L. Hafetz, *The Untold Story of Noncriminal Habeas Corpus and the 1996 Immigration Acts*, 107 Yale L.J. 2509, 2522–23 (1998).

The practice of using the writ to challenge non-criminal detentions continued after the United States secured independence. In 1824, for example, when a father brought a habeas corpus petition seeking to release his minor son from the custody of the child's grandfather, Justice Story considered the case on the merits—effectively recognizing habeas as a cause of action to challenge forms of custody entirely unrelated to a criminal proceeding. *United States v. Green*, 26 F. Cas. 30, 31 (C.C.D.R.I. 1824) (No. 15,256); *see generally* Donald E. Wilkes, Jr., *From Oglethorpe to the Overthrow of the Confederacy: Habeas Corpus in Georgia, 1733-1865*, 45 Ga. L. Rev. 1015, 1036 n.78 (2011) (collecting authorities on use of habeas in child custody disputes). And in 1833, Judge Barbour, citing Matthew Bacon's treatise, wrote that "[w]henever a person is restrained of his liberty, by being confined in a common jail, or by a private person, whether it be for a criminal or civil cause," the writ of habeas corpus was available to inquire into the cause of confinement. *Ex parte Randolph*, 20 F. Cas. 242, 253 (C.C.D. Va. 1833) (No. 11,558). This history shows that habeas proceedings are protective of a civil right and have long extended to many forms of control or detention with no connection to criminal proceedings.

**B. The U.S. Supreme Court and other federal courts have repeatedly affirmed that habeas proceedings are civil actions.**

A habeas petition also historically distinguished the constitutionality of restricting one's liberty from the question of substantive guilt or innocence. Charles Alan Wright, *Habeas Corpus: Its History and Its Future*, 81 Mich. L. Rev. 802, 806 (1983). As the Supreme Court has recognized, the "writ of habeas corpus is not a proceeding in the original criminal prosecution, but an independent civil suit." *Riddle v. Dyche*, 262 U.S. 333, 335–36 (1923); *see also Ex Parte Tom Tong*, 108 U.S. 556, 559–60 (1883) (recognizing a detainee's request for a writ of habeas corpus as "a new suit brought by him to enforce a civil right"). Congress has recognized the same: Collateral relief "proceedings have traditionally been regarded as technically civil in nature rather than criminal," regardless of the nature of the underlying action. H.R. Rep. No. 91-1546 (1970), reprinted in 1970 U.S.C.C.A.N. 3982, 3954. This split between post-detention procedure and the original prosecution explains why habeas petitions are themselves civil actions, regardless of whether the underlying suit giving rise to the detention was criminal or civil.[3]

---

[3] Other practices confirm this understanding. For example, the Government's own self-reported statistics count prisoner habeas petitions as civil actions. Katherine A. MacFarlane, *Shadow Judges: Staff Attorney Adjudication of Prisoner Claims*, 95 Or. L. Rev. 97, 101–02 (2016). Habeas actions "are processed as civil cases and assigned a civil docket number," Katherine A. MacFarlane, *Adversarial No More: How Sua Sponte Assertion of Affirmative Defenses to Habeas Wreaks Havoc on the Rules of Civil Procedure*, 91 Or. L. Rev. 177, 183 (2012), and allow

Against this historical backdrop, the Supreme Court has repeatedly described habeas corpus proceedings as civil actions. In *Tom Tong*—a habeas proceeding challenging a municipal criminal proceeding—the Supreme Court noted that "[p]roceedings to enforce civil rights are civil proceedings, and proceedings for the punishment of crimes are criminal proceedings." 108 U.S. at 559. Although "[t]he prosecution against him is a criminal prosecution," "the writ of *habeas corpus* which he has obtained is not a proceeding in that prosecution" but is instead "a new suit brought by him to enforce a civil right." *Id.* at 559–60. This new suit "is one instituted by himself for his liberty, not by the government to punish him for his crime." *Id.* at 560. "Such a proceeding on his part is . . . a civil proceeding, notwithstanding his object is, by means of it, to get released from custody under a criminal prosecution." *Id.*

The Supreme Court likewise recognized that habeas proceedings challenging an underlying criminal detention were civil proceedings for the purpose of removing a case from state to federal court. *Kurtz v. Moffitt*, 115 U.S. 487, 499 (1885). A few years later, the Court explained that a writ of prohibition was "a civil remedy, given in a civil action," just as "a writ of *habeas corpus*," which the Court had "held to be a civil, and not a criminal, proceeding, even when instituted to arrest a criminal

---

for civil discovery, Katherine Macfarlane, *Prisoner Procedure*, in A Guide to Civil Procedure 6, 59 (Brooke Coleman et al. eds., 2022).

8

prosecution." *Farnsworth v. Montana*, 129 U.S. 104, 113 (1889). By 1892, it was "well settled that a proceeding in *habeas corpus* is a civil, and not a criminal, proceeding." *Cross v. Burke*, 146 U.S. 82, 88 (1892).

To be sure, habeas corpus proceedings have unique features. *Brown v. Vasquez*, 952 F.2d 1164, 1169 (9th Cir. 1991). In certain instances, for example, specific procedural rules may not apply in habeas actions, but "[t]he Federal Rules of Civil Procedure generally govern habeas proceedings." *Banister v. Davis*, 590 U.S. 504, 511 (2020); *see also Schlanger v. Seamans*, 401 U.S. 487, 490 n.4 (1971); *Browder v. Dir., Dep't of Corr. of Ill.*, 434 U.S. 257, 269 (1978) (stating that the Federal Rules of Civil Procedure apply, with limitations, to habeas proceedings). This is not unique to habeas: other causes of action may have unique procedural features without changing the fact that they are civil in nature. *See, e.g.*, 31 U.S.C. § 3730(b) (setting out distinct rights of intervention and claim control in civil actions under False Claims Act); 28 U.S.C. § 1608 (setting out service requirements in civil actions against foreign states).

This settled understanding that habeas corpus actions are civil in nature has persisted to modern day—well after the enactment of the EAJA in 1980. *See, e.g.*, *Banister*, 590 U.S. at 507 (explaining that habeas proceedings are "civil in nature"). In *Hilton v. Braunskill*, for example, the Court stated that its "decisions have consistently recognized that habeas corpus proceedings are civil in nature." 481 U.S.

770, 776 (1987) (collecting cases). And as this Court has explained, habeas corpus is "a separate civil action and not a further step in the criminal case" and "[i]t is not a determination of guilt or innocence of the charge upon which petitioner was sentenced." *United States v. Thomas*, 713 F.3d 165, 170–71 (3d Cir. 2013). When a prisoner succeeds on a habeas petition, "it is usually because some right—such as a lack of counsel—has been denied which reflects no determination of his guilt or innocence but affects solely the fairness of his earlier criminal trial." *Id.*

In short, the history of the writ of habeas corpus confirms that the writ: (1) originated from civil proceedings; (2) exists to protect liberty, a civil right; (3) is a cause of action to challenge civil as well as criminal detention; and (4) is a cause of action brought in civil proceedings, especially when challenging non-criminal detention.

II. **This Court should join the Second and Ninth Circuits in holding that habeas proceedings in immigration cases are civil actions, not "hybrid" actions.**

Consistent with historical practice, the Second and Ninth Circuits have recognized that habeas proceedings challenging immigration detention are civil in nature, and therefore that they can serve as the basis for recovery under the EAJA. *See Vacchio v. Ashcroft*, 404 F.3d 663, 668 (2d Cir. 2005); *In re Petition of Hill*, 775 F.2d 1037, 1041 (9th Cir. 1985). In *Vacchio*, the Second Circuit explained that it had previously "excepted from [the EAJA] *criminal* habeas petitions—in essence,

denying relief to those who bring a collateral civil action (habeas) that has its roots in a criminal action. This is not the case in the context of an immigration habeas petition, which is both a civil action in its own right, and which has its roots in a civil action." *Vacchio*, 404 F.3d at 672.

By contrast, the Fourth and Fifth Circuits rejected claims that the EAJA applies to habeas proceedings related to immigration detention on the ground that they are "hybrid" proceedings, rather than strictly civil in nature. *Gomez Barco v. Witte*, 65 F.4th 782, 785 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 553 (2024); *Obando-Segura v. Garland*, 999 F.3d 190, 193 (4th Cir. 2021). But this approach is contrary to the historical record and federal law. Neither court offered any historical evidence, nor case law, responsive to the issue of EAJA fees where the underlying case is **civil** in nature. In fact, the courts that have called certain habeas proceedings "hybrid" have done so where *criminal* detainees use habeas proceedings to challenge the basis of their underlying *criminal* detention. *See, e.g.*, *O'Brien v. Moore*, 395 F.3d 499, 505 (4th Cir. 2005) (BOP inmate sought EAJA fees; court described habeas action as "hybrid"); *United States v. Cole*, 101 F.3d 1076, 1077 (5th Cir. 1996) (inmate challenging sentence under § 2255; court described habeas as "hybrid"); *Santana v. United States*, 98 F.3d 752, 754–55 (3d Cir. 1996) (same). Obviously, that reasoning is inapplicable here, where plaintiff-appellee is not a criminal defendant but rather a civil plaintiff challenging his immigration detention.

The notion of "hybrid" proceedings does not make sense where, as here, the underlying proceedings themselves are indisputably civil. As the Supreme Court has repeatedly recognized, removal proceedings and immigration detention "are civil, not criminal, and we assume that they are nonpunitive in purpose and effect." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001); *see also INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984) (noting that protections in criminal proceedings do not apply to immigration court because "[a] deportation proceeding is a purely civil action to determine eligibility to remain in this country") (citing 8 U.S.C. §§ 1302, 1306, 1325 (1976)).

Accordingly, the Court should reject the "hybrid" interpretation of habeas proceeding adopted by the Fourth and Fifth Circuits and hold, consistent with historical practice, the Second and Ninth Circuits, and Supreme Court precedent, that habeas proceedings (particularly those emanating from underlying civil proceedings) are civil, and therefore can serve as the basis for recovery under the EAJA. *See Vacchio v. Ashcroft*, 404 F.3d 663, 668 (2d Cir. 2005); *In re Petition of Hill*, 775 F.2d 1037 (9th Cir. 1985).

## CONCLUSION

For these reasons, the Court should affirm the district court's decision.

Dated: May 16, 2025　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　*/s/ Hayley N. Lawrence*

　　　　　　　　　　　　　　　　　　Matt Gregory
　　　　　　　　　　　　　　　　　　Hayley N. Lawrence
　　　　　　　　　　　　　　　　　　GIBSON, DUNN & CRUTCHER LLP
　　　　　　　　　　　　　　　　　　1700 M Street NW
　　　　　　　　　　　　　　　　　　Washington, D.C. 20036
　　　　　　　　　　　　　　　　　　(202) 955-8500
　　　　　　　　　　　　　　　　　　hlawrence@gibsondunn.com

　　　　　　　　　　　　　　　　　　*Counsel for Amici Curiae*

# APPENDIX

The following signatories also join this brief:

**Sameer Ashar**, Clinical Professor of Law, UC Irvine School of Law

**Lenni Benson**, Distinguished Chair of Immigration and Human Rights Law, New York Law School

**Alan Chen**, Thompson G. Marsh Law Alumni Professor, University of Denver Sturm College of Law

**Alina Das**, Professor of Law, New York University School of Law

**Nicole Godfrey**, Assistant Professor of Law, University of Denver Sturm College of Law

**Richard Frankel**, Professor of Law, Co-Director Federal Litigation and Appeals Clinic, Drexel University Thomas R. Kline School of Law

**Niels Frenzen**, Sidney M. and Audrey M. Irmas Endowed Clinical Professor of Law, Co-Director, Immigration Clinic, USC Gould School of Law

**Danielle Jefferis**, Assistant Professor of Law, University of Nebraska College of Law

**Katherine Macfarlane**, Associate Professor of Law, Syracuse University College of Law

**Talia Peleg**, Associate Professor of Law, CUNY School of Law

**Jaya Ramji-Nogales**, Professor of Law, Temple University Law School

**Sarah Rogerson**, Professor of Law, Albany Law School

**Faiza Sayed**, Associate Professor of Law; Director, Safe Harbor Clinic, Brooklyn Law School

**Doug Smith**, Lecturer in Forced Migration and Human Rights, Brandeis University

**Maureen Sweeney**, Professor of Law, University of Maryland Carey School of Law

**Michael Wishnie**, William O. Douglas Clinical Professor of Law, Yale Law School

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 2,879 words, excluding parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point, Times New Roman font.

3. This brief complies with this Court's Rule 28.3(d) because at least one of the attorneys whose names appear on the brief is a member of the bar of this Court.

4. This brief complies with this Court's Rule 31.1(c) because: (1) the text of the electronic brief is identical to the text in the paper document, and (2) the document has been scanned with Reversing Labs Spectra Analyze Malware Analysis Platform 9.4.0, Spectra Core Version 5.3.3-48, and no virus was detected.

Dated: May 16, 2025                         */s/ Hayley N. Lawrence*