# In The United States Court of Appeals for the Third Circuit

―――――――――――――

ADEWUMI ABIOYE,
*Petitioner-Appellee,*

*v.*

WARDEN MOSHANNON VALLEY
PROCESSING CENTER, *et al.*,
*Respondents-Appellants.*

―――――――――――――

ADOLPH MICHELIN,
*Petitioner-Appellee,*

*v.*

WARDEN MOSHANNON VALLEY
PROCESSING CENTER, *et al.*,
*Respondents-Appellants.*

―――――――――――――

On Appeal from the United States District Court
for the Western District of Pennsylvania

―――――――――――――

## BRIEF OF AMICUS CURIAE HIAS PENNSYLVANIA IN SUPPORT OF PETITIONERS-APPELLEES

―――――――――――――

Christopher P. Setz-Kelly
HIAS PENNSYLVANIA
P.O. Box #8688
Philadelphia, PA 19101
215-346-8069
csetz@hiaspa.org

Christopher R. Healy
Kimberly S. Veklerov
TROUTMAN PEPPER LOCKE LLP
3000 Two Logan Square
Philadelphia, PA 19103
215-981-4644
Christopher.Healy@troutman.com
Kimberly.Veklerov@troutman.com

*Counsel for Amicus Curiae*

May 16, 2025

## Disclosure Statement

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), HIAS and Council Migration Service of Philadelphia (HIAS Pennsylvania) states that it is a private, 501(c)(3) non-profit organization that has no parent company and issues no stock, and therefore no publicly held company holds 10% of HIAS Pennsylvania's stock.

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), HIAS Pennsylvania states that no counsel for any party authored any part of this brief, and no person or entity other than *amicus* and its counsel made a monetary contribution to the preparation or submission of this brief.

# Table of Contents

Disclosure Statement ..................................................................... i

Table of Authorities .................................................................. iii

Statement of Consent to File ................................................... vi

Statement of Interest .................................................................. 1

Introduction ................................................................................. 2

Argument ...................................................................................... 3

I.    Legal Representation For Detained Noncitizens In The Third Circuit Is A Growing, Unmet Need .................................. 3

II.   Habeas Petitions Remain An Important Tool For Detained Noncitizens ........................................................................ 7

III.  EAJA Fee Awards Play An Important Gap-Filling Role For Legal Service Providers And Their Clients ................................. 12

Conclusion ................................................................................. 14

Certifications ............................................................................. 16

# Table of Authorities

**Page(s)**

**Cases**

*A.S.R. v. Trump,*
No. 25-cv-00113, — F. Supp. 3d —, 2025 WL 1378784
(W.D. Pa. May 13, 2025) .................................................................. 12

*Astrue v. Ratliff,*
560 U.S. 586 (2010)........................................................................... 13

*Boumediene v. Bush,*
553 U.S. 723 (2008)............................................................................. 2

*D.B.U. v. Trump,*
No. 25-CV-01163, — F. Supp. 3d —, 2025 WL 1163530 (D.
Colo. Apr. 22, 2025)..................................................................... 11–12

*Doe v. U.S. Dep't of Homeland Sec.,*
No. 24-259, 2025 WL 360534 (W.D. Pa. Jan. 31, 2025) ..................... 5

*German Santos v. Warden Pike Cnty. Corr. Facility,*
965 F.3d 203 (3d Cir. 2020) .................................................... 7–10, 14

*G.F.F. v. Trump*, No. 25 CIV. 2886, — F. Supp. 3d —, 2025
WL 1301052 (S.D.N.Y. May 6, 2025)........................................... 11–12

*Gideon v. Wainwright,*
372 U.S. 335 (1963)............................................................................. 2

*Rumsfeld v. Padilla,*
542 U.S. 426 (2004)........................................................................... 12

*Sanusi v. Chertoff,*
No. 7-16, 2008 WL 1995141 (D.N.J. May 6, 2008).................. 9–10, 14

*Tkochenko v. Sabol,*
792 F. Supp. 2d 733 (M.D. Pa. 2011)................................................. 9

*Trump v. J.G.G.,*
145 S. Ct. 1003 (2025)....................................................................... 11

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) .............................................................. 8

**Federal Statutes**

8 U.S.C. § 1226(c) ................................................................... 7

28 U.S.C. § 2412(d)(1)(A) .................................................. 2, 13

28 U.S.C. § 2412(d)(1)(B) .................................................... 14

50 U.S.C. § 21 ....................................................................... 10

**Other Authorities**

Admin. Conf. of the U.S., *Equal Access to Justice Act
    Reporting*, https://tinyurl.com/su33m68u .......................... 14

*Am. Civ. Liberties Union of Pa., Complaint re: Egregious and
    Unconstitutional Conditions of Confinement at the
    Moshannon Valley Processing Center*
    (July 10, 2024), https://tinyurl.com/3454b65z ..................... 6

Dep't of Homeland Sec. Off. for Civ. Rights and Civ.
    Liberties, *Retention and Implementation Review
    Memorandum* at 2 (Aug. 16, 2024),
    https://tinyurl.com/53swpsay ............................................... 6

GEO Grp., Inc., *The GEO Group Awarded 15-Year Contract
    by U.S. Immigration and Customs Enforcement for
    Company-Owned, 1,000-Bed Delaney Hall Facility in New
    Jersey* (Feb. 27, 2025), https://tinyurl.com/3nrh22b3 ......... 5

Ingrid V. Eagly & Steven Shafer, *A National Study of Access
    to Counsel in Immigration Court*, 164 U. Pa. L. Rev. 1, 34
    (2015) .................................................................................... 10

*Laura Romero, Trump Administration Halts Funding for
    Legal Aid for Migrant Children*, ABC News (Mar. 21,
    2025), https://tinyurl.com/4zxxpe8w .................................. 14

Off. of the Immigr. Detention Ombudsman, *OIDO Inspection: Moshannon Valley Processing Center* (Oct. 17, 2022), https://tinyurl.com/43xmdh8e ................................................... 5

U.S. Dep't of Just. Exec. Off. for Immigr. Rev., *Immigration Court List – Administrative Control*, https://tinyurl.com/bdz3df2p ............................................................. 5

U.S. Dep't of Just. Off. of the Inspector Gen., *Results of the Inspection* (Feb. 2003), https://tinyurl.com/bp7b7urp (noting Fiscal Year 1994 figure) ......................................................... 3

U.S. Immigr. and Customs Enf't, *Detention Facilities*, https://tinyurl.com/3j3ru4pd ................................................................ 4

U.S. Immigr. and Customs Enf't, *Detention Statistics*, https://tinyurl.com/2aaf4men ................................................................ 3, 7

U.S. Immigr. and Customs Enf't, *ICE Expands Detention Capacity with Delaney Hall Facility in New Jersey* (Feb. 26, 2025), https://tinyurl.com/5ad3uhb3 ................................................ 4

U.S. Opp. to Pet's Mot. for Prelim. Inj., *A.S.R. v. Trump*, No. 25-cv-00113, ECF059 (W.D. Pa. May 1, 2025) .................................... 12

## Statement of Consent to File

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), HIAS Pennsylvania certifies that it conferred with counsel for Petitioners and for the government, and all parties consented to the filing of this brief.

## Statement of Interest

HIAS and Council Migration Service of Philadelphia (HIAS Pennsylvania) is a private, 501(c)(3) non-profit organization that supports low-income immigrants of all backgrounds as they build new lives in our community. Through immigration legal services and an array of social services, HIAS Pennsylvania works to address their needs, defend their rights, and advocate for their equitable inclusion in American society. As a charitable organization that provides legal representation to indigent noncitizens in immigration detention, HIAS Pennsylvania has an interest in the continuing availability of fee-shifting under the Equal Access to Justice Act in habeas actions challenging civil immigration detention, and more generally in the fair and correct interpretation of the laws governing immigration detention and removal. HIAS Pennsylvania respectfully submits that this *amicus curiae* brief will aid the court by providing information about the state of civil immigration detention in this Circuit and the role that EAJA fees play in facilitating legal representations for those most in need of it.

# Introduction

"The Framers viewed freedom from unlawful restraint as a fundamental precept of liberty, and they understood the writ of habeas corpus as a vital instrument to secure that freedom." *Boumediene v. Bush*, 553 U.S. 723, 739 (2008). Yet this vital instrument has little practical value without legal representation, for as the Supreme Court long ago recognized, "[t]he right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel." *Gideon v. Wainwright*, 372 U.S. 335, 344–45 (1963). Noncitizens in civil immigration proceedings have no right to appointed counsel, either in the removal proceedings themselves or in related habeas corpus actions challenging their civil immigration detention. For the many detained, indigent noncitizens who cannot afford a lawyer, the protections of the Great Writ remain elusive.

In the Equal Access to Justice Act (EAJA), Congress provided a modest corrective. EAJA provides that, in "any civil action (other than cases sounding in tort) … brought by or against the United States," the prevailing party can recover fees and costs if the government's position was not "substantially justified." 28 U.S.C. § 2412(d)(1)(A). The phrase "any civil action" unambiguously includes habeas petitions—which are civil actions—challenging immigration detention—which is civil, not criminal, in nature.

Recovery of EAJA fees helps incentivize counsel to meet the critical and growing need for legal representation for noncitizens. In the Third Circuit and around the country, immigration detention has grown dramatically in recent decades. The average daily population of noncitizens detained in the United States ballooned from 5,532 around 1994 to 49,785 in May 2025.[1] With these skyrocketing numbers and utterly overwhelmed immigration courts come serious due process concerns. Some noncitizens endure years of detention in troubling conditions of confinement as their cases languish in the backlogged immigration system. For many of these people, habeas petitions offer the only vehicle for compelling the government to justify at a bond hearing their continued detention.

## Argument

### I. Legal Representation For Detained Noncitizens In The Third Circuit Is A Growing, Unmet Need

There are five immigration detention facilities in the Third Circuit, including the Moshannon Valley Processing Center in the West-

---

[1] U.S. Immigr. and Customs Enf't, *Detention Statistics*, https://tinyurl.com/2aaf4men (select Fiscal Year 2025 Statistics link at bottom of webpage, then select Detention FY25 tab on spreadsheet) (all websites last visited May 13, 2025); U.S. Dep't of Just. Off. of the Inspector Gen., *Results of the Inspection* (Feb. 2003), https://tinyurl.com/bp7b7urp (noting Fiscal Year 1994 figure).

ern District of Pennsylvania, which is one of the largest in the country.[2] Other facilities in the Third Circuit that detain noncitizens are the Clinton County Correctional Facility (in the Middle District of Pennsylvania), the Federal Detention Center, Philadelphia (Eastern District of Pennsylvania), the Pike County Correctional Facility (same), and the Elizabeth Contract Detention Facility (District of New Jersey).[3] U.S. Immigration and Customs Enforcement (ICE) recently announced that a new, 1,000-bed facility will soon open in Newark, New Jersey, "to manage the region's growing enforcement and removal operations."[4]

Moshannon is in a remote area of central Pennsylvania, making access to legal representation all the more challenging. The facility is located just outside Philipsburg, Pennsylvania, which has a population of fewer than 3,000 people and is more than 100 miles away from Pittsburgh and 200 miles away from Philadelphia. The immigration court in Elizabeth, New Jersey—more than 250 miles away from

---

[2] U.S. Immigr. and Customs Enf't, *Detention Facilities*, https://tinyurl.com/3j3ru4pd (showing four facilities in Pennsylvania, one in New Jersey, and none in Delaware or the Virgin Islands).

[3] *Id.*

[4] U.S. Immigr. and Customs Enf't, *ICE Expands Detention Capacity with Delaney Hall Facility in New Jersey* (Feb. 26, 2025), https://tinyurl.com/5ad3uhb3.

Moshannon—is the assigned court for all Moshannon proceedings.[5] As a result, bond hearings for noncitizens held in Moshannon, when they do take place, are often held remotely. *See, e.g.*, *Doe v. U.S. Dep't of Homeland Sec.*, No. 24-259, 2025 WL 360534, at *2 (W.D. Pa. Jan. 31, 2025) (noting the government's argument that it could not use Moshannon's video-conferencing technology for New Jersey criminal proceedings because Moshannon "needs to prioritize executing immigration laws and use the virtual visitation booths for detainees to speak to asylum officers, immigration counsel, and defense counsel").

Moshannon previously operated as a low-security federal prison, owned by the GEO Group, a private contractor.[6] After the Bureau of Prisons opted not to renew its contract with the facility in 2021, the GEO Group won a different contract to convert the prison to an immigration detention center. With a maximum capacity of 1,878 beds, Moshannon became the largest immigrant detention facility in the northeast United States and one of the largest in the country.[7]

---

[5] U.S. Dep't of Just. Exec. Off. for Immigr. Rev., *Immigration Court List – Administrative Control*, https://tinyurl.com/bdz3df2p.

[6] GEO Group also won a 15-year contract to operate the new Newark detention facility, *supra* note 4. GEO Grp., Inc., *The GEO Group Awarded 15-Year Contract by U.S. Immigration and Customs Enforcement for Company-Owned, 1,000-Bed Delaney Hall Facility in New Jersey* (Feb. 27, 2025), https://tinyurl.com/3nrh22b3.

[7] Off. of the Immigr. Detention Ombudsman, *OIDO Inspection: Moshannon Valley Processing Center* at 3 (Oct. 17, 2022), https://tinyurl.com/43xmdh8e.

In 2022, within a year of Moshannon's conversion to a detention facility, the Department of Homeland Security's Office for Civil Rights and Civil Liberties opened an investigation into the facility after receiving numerous reports of use-of-force incidents and sexual assaults. A complaint filed by the ACLU of Pennsylvania recounts some of the investigation's findings, including a lack of language translation resources for detainees.[8] In response to the complaint, the Office announced in August 2024 that it would open another investigation into Moshannon to examine the allegations, which included due process and legal-access violations.[9]

Moshannon not only is located in a remote, isolated area of Pennsylvania, but also confines more detainees in isolation compared to other detention facilities, according to recent ICE data. As of April 2025, Moshannon had the highest number of detained individuals confined to segregated housing units out of any immigration detention facility in the United States. Moshannon placed nearly twice the number of detainees in solitary confinement than the next-highest facility.

---

[8] *See* Am. Civ. Liberties Union of Pa., *Complaint re: Egregious and Unconstitutional Conditions of Confinement at the Moshannon Valley Processing Center* at 6–7 (July 10, 2024), https://tinyurl.com/3454b65z.

[9] The announcement has since been deleted from the Department of Homeland Security website but is archived elsewhere. *See* Web Archive, Dep't of Homeland Sec. Off. for Civ. Rights and Civ. Liberties, *Retention and Implementation Review Memorandum* at 2 (Aug. 16, 2024), https://tinyurl.com/53swpsay.

For example, Moshannon placed 163 individuals in segregation in April 2025; the second- and third-highest ranking facilities by segregation were Texas ICE processing centers that placed 90 and 81 individuals, respectively, in segregation in February.[10]

## II. Habeas Petitions Remain An Important Tool For Detained Noncitizens

Habeas is critical for detained noncitizens, particularly at the extremes of government action or inaction: those who endure prolonged detention for years without a bond hearing and, more recently, those in detention who face removal from the United States without a hearing and with just hours' notice.

**1.** Many noncitizens face months or years of detention while their cases proceed through immigration court, the Board of Immigration Appeals, and this Court—and, not uncommonly, down and back again. Under 8 U.S.C. § 1226(c), for example, noncitizens convicted of certain crimes are subject to mandatory detention during the pendency of removal proceedings. This Court has recognized, however, that prolonged detention under Section 1226(c) can become "unreasonable," at which point due process requires that the noncitizen be granted a bond hearing. *German Santos v. Warden Pike Cnty. Corr. Facility*, 965 F.3d 203, 213 (3d Cir. 2020); *see also Zadvydas v. Davis*, 533 U.S. 678, 699 (2001) (holding that habeas statute gives federal

---

[10] *See Detention Statistics*, *supra* note 1 (monthly segregation tab).

courts authority to review continued detention of noncitizens follow-
ing statutory removal period). At the bond hearing, the government
must show, with individualized evidence that is clear and convincing,
that continued detention is necessary because the noncitizen poses ei-
ther a flight risk or a danger to the community. *German Santos*, 965
F.3d at 214.

In many instances, including the two cases presently under re-
view, it takes the noncitizen filing a habeas petition in federal court
to force the government to comply with its constitutional obligation to
provide a bond hearing. In those cases, habeas is the only mechanism
for noncitizens to avoid prolonged, arbitrary, unconstitutional deten-
tion.

For instance, in *German Santos*, this Court reversed the denial
of a habeas petition and ordered a bond hearing for the detained peti-
tioner, who had been in custody more than two and a half years while
awaiting a decision in his removal proceedings. That was "an unrea-
sonably long time" to be detained with "no end in sight." 965 F.3d at
213. A bond hearing was thus required "to gauge whether he still
need[ed] to be detained to keep him from fleeing or committing more
crimes." *Id*.

In *Sanusi v. Chertoff*, the court granted the habeas petition of a
noncitizen who had been detained for more than ten years. Civ. No. 7-
16, 2008 WL 1995141, at *3–4 (D.N.J. May 6, 2008). In granting the

petition, the court noted it was troubled by the government's failure to consider any release plan or a renewed custody review, even though the noncitizen's many appeals contributed to the length of detention. *Id.* The court ruled that the petitioner's continued detention of over a decade violated due process, noting factors such as his "lack of any criminal history or disciplinary violations while in custody," "the fact that [he] had never been deemed a flight risk or a danger to the community," "the fact that the Government had not been able to … predict how much longer [he] might be detained," and, most obviously, "the sheer duration of [his] detention to date." *Id.* at *2.

In *Tkochenko v. Sabol*, the court granted the habeas petition of a detained Ukrainian woman where an immigration judge had made a positive credible fear determination. 792 F. Supp. 2d 733 (M.D. Pa. 2011). She was nonetheless kept for two years at the York County Prison. *Id.* at 736. The court granted her habeas petition and ordered a hearing to determine whether she would be a flight risk or danger to the community if released. *Id.* at 735.

In these and many other cases, habeas provided the only means for obtaining review of noncitizens' indefinite detentions. Not surprisingly, the foregoing examples of successful habeas petitions all involved cases where the petitioner had legal representation. In *Sanusi*, in fact, the court awarded fees under EAJA of $7,094.01—not a large sum, but enough to help vindicate the petitioner's rights. 2008 WL

1995141, at *4; *see also German Santos*, No. 19-2663 (3d Cir. Feb. 19, 2021) (Dkt. No. 98) (granting stipulated EAJA award of $31,305). In the mine run of cases, however, detained immigrants have no access to legal representation. A 2015 study found that just 14% of detained immigrants had counsel. Ingrid V. Eagly & Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 U. Pa. L. Rev. 1, 34 (2015). The presence of counsel had a significant effect on outcomes. Detained immigrants with legal representation "were almost seven times more likely than their *pro se* counterparts to be released from the detention center." *Id.* at 70. Having an attorney also meant they were more likely to get a custody hearing in the first place (44% for represented immigrants, versus 18% for those proceeding *pro se*). *Id.*

**2.** At the other extreme, there is an urgent need for legal representation for noncitizens whom the government seeks to remove with mere hours of notice. The availability of fee and cost recovery can help facilitate counsel for those most in need of it.

After the federal government this year began removing noncitizens under the Alien Enemies Act, 50 U.S.C. § 21, the Supreme Court held that the writ of habeas corpus was the sole and exclusive means through which noncitizens could challenge their detention and removal under the Act. *Trump v. J.G.G.*, 145 S. Ct. 1003, 1005–06 (2025) (holding that detainees' claims for relief had to be brought in habeas

in district of confinement, rather than as putative class action in District of Columbia under Administrative Procedure Act). The Supreme Court made clear that noncitizens "must receive notice" "that they are subject to removal under the Act," and that such "notice must be afforded within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs." *Id.* at 1006.

In subsequent habeas actions, however, the government has taken the position that it need only give noncitizens 24 hours' notice of their imminent removal under the Act. *See, e.g.*, *D.B.U. v. Trump*, No. 25-CV-01163, — F. Supp. 3d —, 2025 WL 1163530, at *12 (D. Colo. Apr. 22, 2025); *G.F.F. v. Trump*, No. 25 CIV. 2886, — F. Supp. 3d —, 2025 WL 1301052, at *5 (S.D.N.Y. May 6, 2025) (noting government position that Alien Enemies Act detainees have "a dozen hours" "to express an intent to file a" habeas petition, and "another 24-hour period" "to actually file" the petition). That means 24 hours to find a lawyer who is both admitted to practice in the relevant district of confinement, and willing and able to undertake the representation; 24 hours to write a cogent habeas petition; 24 hours to file the petition; and perhaps even 24 hours to obtain relief. *See id.* ("[E]ven if an alien files for habeas relief, Respondents state that they still may deport him if the court does not grant a temporary restraining order, or takes too long to conduct the proceeding."). While a number of courts have

certified classes and issued preliminary injunctions barring the government from removing noncitizens under the Act without adequate notice, *see D.B.U.*, 2025 WL 1163530, at *14 (requiring at least 21 days' notice), or at all, *see G.F.F.*, 2025 WL 1301052, at *12, the government continues to assert that due process is satisfied if it gives noncitizens just 24 hours to seek and obtain habeas relief, *see* U.S. Opp. to Pet's Mot. for Prelim. Inj. at 24–25, *A.S.R. v. Trump*, No. 25-cv-00113, ECF059 (W.D. Pa. May 1, 2025); *see also A.S.R. v. Trump*, — F. Supp. 3d —, 2025 WL 1378784, at *19 (W.D. Pa. May 13, 2025).

These people need lawyers. And because habeas petitions generally must be filed in the U.S. district court in which the petitioner is confined, *see Rumsfeld v. Padilla*, 542 U.S. 426, 443 (2004), they need lawyers who are admitted to practice in that district. Many detention facilities—including Moshannon in this Circuit—are remote, away from population centers with large private bars or legal services organizations. *See* p. 4, *supra* (noting that Moshannon is 100 miles from Pittsburgh and 200 miles from Philadelphia). The potential for recovering fees and costs helps to funnel counsel to the areas where they are most needed.

### III. EAJA Fee Awards Play An Important Gap-Filling Role For Legal Service Providers And Their Clients

For the private bar, non-profit attorneys, and the government alike, the availability of EAJA fee awards serves multiple, important

functions. First, EAJA fees incentivize private attorneys to take on meritorious habeas petitions for detained, indigent noncitizens who cannot afford to hire legal counsel. Second, non-profit legal service providers can use the availability of EAJA fees to plan and allocate their limited resources. Third, EAJA fees may deter the government from taking litigation positions that are not "substantially justified." 28 U.S.C. § 2412(d)(1)(A).

This Court should maintain the long-held status quo in this Circuit that recognizes the availability of EAJA fee awards for successful civil immigration habeas petitions. Although an award is never guaranteed in any given case, the understanding that EAJA fees are at least possible no doubt has factored into some organizations' resource-allocation decisions in the Third Circuit. "EAJA's admirable purpose will be undercut if lawyers fear that they will never actually receive attorney's fees to which a court has determined the prevailing party is entitled." *Astrue v. Ratliff*, 560 U.S. 586, 600 (2010) (Sotomayor, J., concurring). EAJA fees—and their potential to motivate the private bar to take on habeas cases—are all the more important in the wake of severe federal funding cuts to legal aid providers.[11]

---

[11] *See, e.g.*, Laura Romero, *Trump Administration Halts Funding for Legal Aid for Migrant Children*, ABC News (Mar. 21, 2025), https://tinyurl.com/4zxxpe8w.

At the same time, EAJA fees are not a cash cow. They are not awarded as a matter of course and require proving that the government's position "was not substantially justified." 28 U.S.C. § 2412(d)(1)(B). An EAJA database maintained by the Administrative Conference of the United States shows an annual average of just 14 fee awards for habeas claims throughout the country.[12] EAJA fees provide modest recompense for attorneys who successfully vindicate their clients' civil rights. For instance, in the case of the immigrant held more than ten years in custody, the court approved the attorney's EAJA fee request of $7,094. *Sanusi*, 2008 WL 1995141, at *4; *see also German Santos*, No. 19-2663 (3d Cir. Feb. 19, 2021) (Dkt. No. 98) (granting EAJA award of $31,305).

## Conclusion

For noncitizens held in prolonged detention while awaiting a removal decision or other proceedings, habeas petitions are often the only mechanism through which they can get a hearing to review their confinement. EAJA fees provide important incentives for attorneys litigating on their behalf. For stretched legal service providers, certainty in the continued availability of EAJA fee awards is essential to staff planning and resource allocation.

---

[12] Admin. Conf. of the U.S., *Equal Access to Justice Act Reporting*, https://tinyurl.com/su33m68u (enter search for "habeas").

Respectfully submitted,

Dated: May 16, 2025

/s/ *Christopher R. Healy*
Christopher R. Healy
Kimberly S. Veklerov
TROUTMAN PEPPER LOCKE LLP
3000 Two Logan Square
Philadelphia, PA 19103
215-981-4644
*Christopher.Healy@troutman.com*

Christopher P. Setz-Kelly
HIAS PENNSYLVANIA
P.O. Box #8688
Philadelphia, PA 19101
215-346-8069
csetz@hiaspa.org

**Certifications**

1.  <u>Bar Membership</u>

    I hereby certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2.  <u>Certificate of Compliance with Rules 29 and 32(a) and LAR 31.1(c)</u>

    This brief complies with the type volume, typeface, and typestyle requirements of Federal Rules of Appellate Procedure 29 (a)(5) and 32(a)(5) and (6), because it contains 3,128 words, exclusive of the cover, tables, and certificates, and has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook font.

    In accordance with Third Circuit LAR 31.1(c), I certify that the text of the electronic brief is identical to the text of the paper copies being filed. I further certify that the electronic submission was subjected to a virus scan using Microsoft Defender.

3.  <u>Certificate of Service</u>

    I hereby certify that, on May 16, 2025, a true and correct copy of this document was served on counsel of record through the Court's CM/ECF system.

    Dated: May 16, 2025          */s/ Christopher R. Healy*
                                 Christopher R. Healy

16