# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

| | |
|---|---|
| **ADEWUMI ABIOYE,** | **ADOLPH MICHELIN,** |
| *Petitioner-Appellee,* | *Petitioner-Appellee,* |
| v. | v. |
| **WARDEN MOSHANNON VALLEY CORRECTIONAL CENTER**, *et al.*, | **WARDEN MOSHANNON VALLEY CORRECTIONAL CENTER**, *et al.*, |
| *Respondents-Appellants.* | *Respondents-Appellants.* |
| On Appeal from the United States District Court for the District of Western Pennsylvania Civil Action No. 3:23-cv-0251 | On Appeal from the United States District Court for the District of Western Pennsylvania Civil Action No. 3:23-cv-22 |

## BRIEF OF NATIONAL IMMIGRATION PROJECT AND IMMIGRATION ORGANIZATIONS AS AMICI CURIAE IN SUPPORT OF PETITIONERS-APPELLEES AND AFFIRMANCE

Samuel Levander
Charity E. Lee
Sarah E. Libowsky
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Fax: (212) 225-3999
*Counsel for Amici Curiae*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................... iii

STATEMENT OF AMICI CURIAE ............................................. 1

SUMMARY OF ARGUMENT .................................................... 4

ARGUMENT ............................................................................ 6

I.    INDIVIDUALS IN CIVIL IMMIGRATION
DETENTION OFTEN LACK ACCESS TO COUNSEL.................... 6

    A.    An overwhelming number of immigrants face
lengthy civil detention in inhumane conditions of
confinement. ............................................................... 6

    B.    Access to legal representation is in short supply. ...... 11

    C.    Access to counsel is crucial to navigating the
complex legal regimes governing immigration
detention. .................................................................... 14

II.    HABEAS PROCEEDINGS CHALLENGING CIVIL
IMMIGRATION DETENTION ARE "CIVIL
ACTIONS" UNDER EAJA................................................. 17

    A.    The plain language of EAJA unequivocally and
unambiguously encompasses immigration habeas
proceedings.................................................................. 18

    B.    The sovereign immunity canon of statutory
interpretation does not apply in light of the
unequivocal and unambiguous language of EAJA. ................... 19

        1.    EAJA's waiver of sovereign immunity for
habeas proceedings challenging civil
immigration detention is unequivocal.............................. 20

2.     Immigration habeas proceedings should not be treated differently from all other civil actions. ................................................................. 21

3.     Habeas proceedings challenging immigration detention are not "hybrid.".......................... 23

4.     The Government's reliance on the sovereign immunity canon is misplaced........................... 24

C.     Applying EAJA to immigration habeas proceedings is consistent with the Congressional purpose of eliminating barriers to remediate and deter unlawful governmental action.......................... 26

CONCLUSION ............................................................. 29

CERTIFICATE OF BAR MEMBERSHIP....................................... 30

CERTIFICATE OF SERVICE ....................................... 31

CERTIFICATE OF COMPLIANCE ................................ 32

CORPORATE DISCLOSURE STATEMENT ............................ 33

**Cases**

*Abioye v. Oddo*,
    704 F. Supp. 3d 625 (W.D. Pa. 2023) ...................................................... 23

*Abioye v. Warden Moshannon Valley Processing Center*,
    No. 24-cv-3198, Dkt. 14 (3d Cir. Mar. 10, 2025) ............... 1, 20, 21, 23, 24

*Boudin v. Thomas*,
    732 F.2d 1107 (2d Cir. 1984) ...................................................... 24

*Browder v. Dir., Dep't of Corr. of Ill.*,
    434 U.S. 257 (1978) ...................................................... 19

*Castro-O'Ryan v. U.S. Dep't of Immigr. & Naturalization*,
    847 F.2d 1307 (9th Cir. 1987) ...................................................... 15

*Conn. Nat'l Bank v. Germain*,
    503 U.S. 249 (1992) ...................................................... 18

*Daley v. Federal Bureau of Prisons*,
    199 F. App'x 119 (3d Cir. 2006) ...................................................... 24

*Dolan v. U.S. Postal Serv.*,
    546 U.S. 481 (2006) ...................................................... 24, 25

*Ewing v. Rodgers*,
    826 F.2d 967 (10th Cir. 1987) ...................................................... 24

*F.A.A. v. Cooper*,
    566 U.S. 284 (2012) ...................................................... *passim*

*Fisher v. Baker*,
    203 U.S. 174 (1906) ...................................................... 19

*Handron v. Sec'y Dep't of Health and Hum. Servs.*,
    677 F.3d 144 (3d Cir. 2012)..................................................... 18

*Hilton v. Braunskill*,
    481 U.S. 770 (1987) ............................................................. 18, 19

*In re Fosamax (Alendronate Sodium) Prods. Liab. Litig.*,
    118 F.4th 322 (3d Cir. 2024)................................................... 22

*Jennings v. Rodriguez*,
    583 U.S. 281 (2018) ............................................................. 7

*Johnson v. Gonzales*,
    416 F.3d 205 (3d Cir. 2005)................................................... 22

*Khalil v. Joyce*,
    No. 25-cv-01963 (MEF)(MAH), 2025 WL 972959 (D.N.J. Apr. 1,
    2025), *pet. for permission to appeal denied*, No. 25-cv-8019 (3d Cir.
    May 6, 2025) ......................................................................... 13

*Khan Suri v. Trump*,
    No. 1:25-cv-480, 2025 WL 1310745 (E.D. Va. May 6, 2025)............... 13

*Kosak v. United States*,
    465 U.S. 848 (1984) ............................................................. 25

*Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*,
    599 U.S. 382 (2023) ............................................................. 20, 21

*Maldonado-Velasquez v. Moniz*,
    No. 17-cv-1918 (1st Cir. Nov. 28, 2017) ................................... 17

*Michelin v. Oddo*,
    No. 3:23-cv-22, 2024 WL 3937228 (W.D. Pa. Aug. 26, 2024)............. 23

*O'Brien v. Moore*,
    395 F.3d 499 (4th Cir. 2005).................................................. 24

*Öztürk v. Hyde*,
    No. 25-cv-1019, 2025 WL 1318154 (2d Cir. May 7, 2025) ................... 13

*Padilla v. Kentucky*,
    559 U.S. 356 (2010) .................................................................. 5

*Richlin Sec. Serv. Co. v. Chertoff*,
    553 U.S. 571 (2008) .................................................................. 24

*Rosenberg v. XM Ventures*,
    274 F.3d 137 (3d Cir. 2001) ..................................................... 18

*Santana v. United States*,
    98 F.3d 752 (3d Cir. 1996) .................................................. 23, 24

*SAS Inst. Inc. v. Iancu*,
    584 U.S. 357 (2018) .................................................................. 21

*Scarborough v. Principi*,
    541 U.S. 401 (2004) .................................................................. 26

*Tressler v. Heckler*,
    748 F.2d 146 (3d Cir. 1984) ..................................................... 22

*Trump v. J. G. G.*,
    145 S. Ct. 1003 (2025) ............................................................. 11

*United States v. Smith*,
    499 U.S. 160 (1991) .................................................................. 21

*Wilkett v. I.C.C.*,
    844 F.2d 867 (D.C. Cir. 1988) .................................................. 22

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ............................................................ *passim*

## Rules and Statutes

5 U.S.C. § 504(b)(1)(C) ................................................................ 22

8 U.S.C. § 1362 ............................................................................. 11

28 U.S.C. § 2412(d)(1)(A) ................................................... 5, 17, 18

H.R. Rep. No. 96-1418 .................................................................. 27

## **Other Authorities**

Alina Das, *Immigration Detention: Information Gaps and Institutional Barriers to Reform*, 80 U. CHI. L. REV. 137 (2013) ....................................... 14, 26

Am. C.L. Union, *Deadly Failures: Preventable Death in U.S. Immigration Detention* (June 2024) ........................................................................ 9

Am. C.L. Union, *No Fighting Chance: ICE's Denial of Access to Counsel in U.S. Immigration Detention Centers* (2022) ................................... 12, 13

ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 285 (2012) .............................. 25

Arelis B. Hernandez & Tobi Raji, *What to Know About Delaney Hall, Where Newark's Mayor Was Arrested*, WASH. POST (May 10, 2025) ........... 8

Dep't Homeland Sec. & U.S. Immigr. & Customs Enf't, *Access to Due Process: Fiscal Year 2021 Report to Congress* (Feb. 14, 2022) .................... 11, 12

*Detainee Death Reporting*, ICE, (last visited May 13, 2025) ....................... 9

*Detention Facilities Average Daily Population*, TRAC (last visited May 13, 2025) ..................................................................................... 9, 10

Dep't of Homeland Sec. Off. for C.R. & C.L., *Summary of CRCL's Recommendations and ICE's Response Moshannon Valley Processing Center* (June 23, 2023) .................................................................. 11

Donald Kerwin & Serena Yi-Ying Lin, *Immigration Detention: Can ICE Meet Its Legal Imperatives and Case Management Responsibilities?*, MIGR. POL'Y INST. (Sept. 2009) .............................................................. 6

Fola Akinnibi and Rachel Adams-Heard, *Trump Administration Aims to Bring Back Detention Centers for Immigrant Kids*, BLOOMBERG (Mar. 21, 2025) ......................................................................................... 15

Gregory C. Sisk, *Twilight for the Strict Construction of Waivers of Federal Sovereign Immunity*, 92 N.C. L. REV. 1245 (2014) ...................................... 25

*ICE Detainees*, TRAC (last visited May 13, 2025) ...................................... 6

*Immigration Detention Quick Facts*, TRAC (last visited May 13, 2025) ...... 7

Ingrid V. Eagly & Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 UNIV. PA. L. REV. 1 (2015) .................................... 12, 13

Ingrid V. Eagly & Steven Shafer, *Access to Counsel in Immigration Court*, AM. IMMIGR. COUNCIL (2016)...................................................................... 16

Johan Fatemi, *A Constitutional Case for Appointed Counsel in Immigration Proceedings: Revisiting Franco-Gonzalez*, 90 ST. JOHN'S L. REV. 915 (2016) ......................................................................................................... 26

Judge Robert A. Katzmann, *The Legal Profession and the Unmet Needs of the Immigrant Poor*, 21 GEO. J.L. ETHICS 3 (2008)...................................... 12

Judge Robert A. Katzmann, *Study Group on Immigrant Representation: The First Decade*, 87 FORDHAM L. REV. 485 (2018)........................................... 13, 14

Kathryn O. Greenberg Immigr. Just. Clinic, *Held Incommunicado: The Failed Promise of Language Access in Immigration Detention* (Aug. 2024) 15

Laila L. Hlass & Mary Yanik, *No End in Sight: Prolonged and Punitive Immigration Detention in Louisiana*, TULANE UNIV. L. SCH. IMMIGR. RTS. CLINIC (May 2021)...................................................................................... 16, 27

*New Proceedings Filed in Immigration Court*, TRAC (last visited May 8, 2025) ......................................................................................................... 12, 17

Nicholas Dale Leal, *'Inhumane Conditions' and Death at Miami's Krome Migrant Detention Center*, EL PAÍS (Apr. 1, 2025) ...................................... 9

Steering Comm. of the N.Y. Immigrant Representation Study Report, *Accessing Justice: The Availability and Adequacy of Counsel in Removal Proceedings*, 33 CARDOZO L. REV. 357 (2011) ............................................... 16

Oliver Laughland, *'Detention Alley': Inside the Ice Centres in the US South Where Foreign Students and Undocumented Migrants Languish*, THE GUARDIAN (May. 29, 2025) ........................................................... 12, 13

Philip L. Torrey, *Rethinking Immigration's Mandatory Detention Regime: Politics, Profit, and the Meaning of "Custody,"* 48 U. MICH. J.L. REFORM 879 (2015) .................................................................................. 7, 8

RFK Human Rights, Am. C.L. Union, et al., *Inside the Black Hole: Systemic Human Rights Abuses Against Immigrants Detained & Disappeared in Louisiana* (Aug. 2024) ............................................................ 8, 13, 15

Physicians for Hum. Rts., *"Endless Nightmare": Torture and Inhuman Treatment in Solitary Confinement in U.S. Immigration Detention* (Feb. 6, 2024 ....................................................................................... 9

Sabrina Balgamwalla, *ICE Transfers and the Detention Archipelago*, 31 J.L. & POL'Y 1 (2022) ........................................................................... 14

Temple Univ. Beasley Sch. L. Ctr. for Soc. Just., *In the Shadow of the Valley: The Unnecessary Confinement and Dehumanizing Conditions of People in Immigration Detention at Moshannon Valley Processing Center* (2024) ................................................................................ 8, 9, 10, 27

Peter Becker, *Pike County gets amended ICE prison contract for detaining illegal immigrants*, TRI-COUNTY INDEPENDENT (Jan. 12, 2022) ................... 27, 28

U.S. Immigration & Customs Enforcement ("ICE"), *ICE Annual Report Fiscal Year 2024* (Dec. 19, 2024) ................................................. 6, 7

## STATEMENT OF AMICI CURIAE[1]

Amici curiae are non-profit and non-governmental organizations who provide legal services to immigrants in detention and advocate for a more just immigration system, and who share an interest in affirming the District Courts' decisions holding that the Equal Access to Justice Act is applicable to immigration habeas proceedings.

The National Immigration Project of the National Lawyers Guild ("National Immigration Project") is a non-profit membership organization of immigration attorneys, legal workers, jailhouse lawyers, grassroots advocates, and others working to defend the rights of immigrants and to secure due process in the immigration system. The National Immigration Project provides technical assistance to attorneys and advocates, litigates on behalf of noncitizens and as amicus curiae in the federal courts, hosts continuing legal education seminars on the rights of noncitizens, and authors numerous practice advisories and treatises. Through its membership network and its litigation, the National Immigration

_____

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(2), all parties, through counsel, have consented to the filing of a consolidated amicus brief in the above-captioned cases on the May 16, 2025 deadline for amicus briefs in *Abioye v. Warden Moshannon Valley Processing Center*, No. 24-cv-3198, Dkt. 14 (3d Cir. Mar. 10, 2025). Pursuant to Rule 29(a)(4)(E), Amici state that no party's counsel authored any portion of this brief and no party, party counsel, or person other than Amici or their counsel contributed money to fund the preparation or submission of this brief.

Project is acutely aware of the problems faced by noncitizens who are detained for extended periods of time and have very limited access to legal representation or other assistance to obtain release from detention.

Robert F. Kennedy Human Rights ("RFKHR") is a non-governmental organization founded in 1968 by the family and friends of former United States Attorney General Robert F. Kennedy to continue his legacy of fighting for a more just and peaceful world. The litigation team at RFKHR works to protect human rights in the criminal justice and immigration systems. They litigate in federal courts across the country, including habeas petitions on behalf of detainees.

The Center for Constitutional Rights ("CCR") is a national, nonprofit legal, educational, and advocacy organization dedicated to protecting and advancing rights guaranteed by the United States Constitution and international law. Founded in 1966, CCR has litigated numerous habeas petitions on behalf of people detained by the United States in immigration detention centers throughout the country, at the Guantánamo Bay Naval Base, and most recently at the Centro de Confinamiento del Terrorismo ("CECOT") in El Salvador.

The National Immigrant Justice Center ("NIJC") is a non-profit corporation dedicated to ensuring human rights protections and access to justice for all immigrants, refugees, and asylum seekers through advocacy, educational initiatives, and direct representation. NIJC provides direct legal services to

approximately 8,000 individuals annually, including representation in removal proceedings and habeas proceedings.

The American Immigration Council (the "Council") is a national non-profit organization established to increase public understanding of immigration law and policy, advocate for the just and fair administration of our immigration laws, and protect the legal rights of noncitizens. The Council has a strong interest in ensuring that noncitizens unlawfully detained do not unfairly bear the legal costs of challenging their detention and that attorneys can seek Equal Access to Justice Act fees for providing vital representation to noncitizens in civil habeas proceedings.

The American Immigration Lawyers Association ("AILA") is a national non-profit association with nearly 17,000 members throughout the United States and abroad, including lawyers and law school professors who practice and teach in the field of immigration and nationality law. AILA seeks to advance the administration of law pertaining to immigration, nationality, and naturalization; and to facilitate the administration of justice and elevate the standard of integrity, honor, and courtesy of those appearing in a representative capacity in immigration and naturalization matters. As part of its mission, AILA provides trainings, information, and practice advisories to practitioners providing direct services to noncitizens, and to counsel representing noncitizens accused of criminal offenses in federal and state courts.

# SUMMARY OF ARGUMENT

Over the last several decades, the Federal Government has detained increasing numbers of immigrants during the pendency of their removal proceedings. These civil detentions—when unlawful—present "serious constitutional problem[s]." *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Detained immigrants have limited recourse to challenge their detention, and because immigration processes are notoriously slow, many immigrants remain civilly detained for months or even years. Petitioners-Appellees Adewumi Abioye ("Mr. Abioye") and Adolph Michelin ("Mr. Michelin") were each detained for more than 18 months and won their freedom only by securing counsel to file successful habeas petitions. The right to be free from such unlawful detention "lies at the heart of the liberty that [the Due Process] Clause protects." *Id*.

Immigrants often face an uphill battle to secure their liberty interests and obtain release from unlawful detention because they lack access to counsel. Without legal counsel, the odds of prevailing in an immigration habeas action can be extremely low. Detained immigrants are often ill-equipped to challenge unlawful detention without legal assistance.

In 1980, Congress passed the Equal Access to Justice Act ("EAJA" or the "Statute") to limit arbitrary, unlawful, and abusive governmental action. By passing this law, Congress intended to remove financial barriers for individuals

4

challenging unjustified governmental action.  To accomplish this, EAJA allows for the recovery of attorneys' fees if an eligible party prevails in a civil suit against the Government unless the Government can show that its position was "substantially justified" or that "special circumstances make an award unjust."  28 U.S.C. § 2412(d)(1)(A).

Successful challenges to unlawful civil immigration detention fall squarely within the plain language and purpose of EAJA.  By its own terms, EAJA applies to "any civil action."  *Id.*  Here, the District Courts held that immigrants who successfully challenge their unlawful immigration detention via a habeas petition can recover attorneys' fees under EAJA.  Those rulings are consistent with the expansive scope of the statutory text of EAJA and Supreme Court precedent holding that removal proceedings are civil in character.  *See, e.g.*, *Padilla v. Kentucky*, 559 U.S. 356, 365 (2010).  The Government tries to sidestep the plain language of EAJA by arguing that the sovereign immunity canon of statutory interpretation requires a narrower atextual reading of "any civil action."  But that canon is inapplicable where, as here, the statute unequivocally and unambiguously waives sovereign immunity.  *See F.A.A. v. Cooper*, 566 U.S. 284, 290 (2012).

Moreover, applying EAJA to immigration proceedings is consistent with EAJA's purpose.  The tens of thousands of people in immigration detention are exactly the kind of under-resourced litigants whose challenges to governmental

action EAJA was designed to facilitate. The availability of attorneys' fees in the immigration habeas context reduces the risk of unnecessary litigation by incentivizing the Government to evaluate whether it can take a substantially justifiable position at the outset of an immigration habeas proceeding. Accordingly, this Court should affirm the orders of the District Courts.

## ARGUMENT

### I. INDIVIDUALS IN CIVIL IMMIGRATION DETENTION OFTEN LACK ACCESS TO COUNSEL.

#### A. An overwhelming number of immigrants face lengthy civil detention in inhumane conditions of confinement.

The Government incarcerates hundreds of thousands of immigrants under an immigration detention regime with few legal protections. Immigration detention has grown dramatically in the past 30 years, with the average number of individuals in federal immigration detention increasing by seven-fold between 1994 and 2025.[2] The United States detained over 250,000 immigrants in 2024[3]

---

[2] *Compare* Donald Kerwin & Serena Yi-Ying Lin, *Immigration Detention: Can ICE Meet Its Legal Imperatives and Case Management Responsibilities?*, MIGR. POL'Y INST. 6 (Sept. 2009) (6,785 immigrants detained daily in 1994), *available at* https://www.migrationpolicy.org/sites/default/files/publications/detentionreportSept1009.pdf, *with ICE Detainees*, TRAC, (47,892 immigrants detained daily as of March 23, 2025), *available at* https://tracreports.org/immigration/detentionstats/pop_agen_table.html (last visited May 13, 2025).

[3] *See* U.S. Immigration & Customs Enforcement ("ICE"), *ICE Annual Report Fiscal Year 2024* 23 (Dec. 19, 2024) (277,913 ICE Enforcement and Removal Operations initial book-ins in January through September 2024), *available at*

and over 80,000 immigrants in the first four months of 2025 alone,[4] many of whom

have no criminal record[5] and have resided in the United States for many years.

These detentions can last for months, if not years. *See Jennings v. Rodriguez*, 583

U.S. 281, 343 (2018) (Breyer, J., dissenting) ("[T]housands of people here are held

[in immigration detention] for considerably longer than six months"); *Zadvydas*,

533 U.S. at 691 (noting that the petitioners' civil immigration detention in that case

would be "not limited, but potentially permanent" absent a writ of habeas corpus).

Because immigration detention is not considered criminal detention under

the law, the constitutional protections of criminal proceedings do not apply.[6] But

despite being civil detention under the law, in practice, immigration detention

restricts personal freedoms in similar ways to criminal incarceration. Detained

immigrants—regardless of whether they have a criminal record—wear jumpsuits,

are placed in shackles, have limited freedom of movement, and face disciplinary

---

https://www.ice.gov/doclib/eoy/iceAnnualReportFY2024.pdf; *see also Immigration Detention Quick Facts*, TRAC [hereinafter "*Immigration Detention Quick Facts*"] (259,844 ICE and CBP total book-ins to detention in 2024), *available at* https://tracreports.org/immigration/quickfacts/detention.html (last visited May 13, 2025).

[4] *See Immigration Detention Quick Facts*, *supra* note 3 (82,990 book-ins in January through April 2025).

[5] *Immigration Detention Quick Facts*, *supra* note 3 (43.4 percent of individuals in immigration detention had no criminal record as of May 4, 2025).

[6] *See* Philip L. Torrey, *Rethinking Immigration's Mandatory Detention Regime: Politics, Profit, and the Meaning of "Custody,"* 48 U. MICH. J.L. REFORM 879, 880–81 (2015).

infractions for disobeying orders.[7]  Many detained immigrants are housed in the

very same facilities and units as criminal detainees.[8]  Many facilities used

exclusively for immigration detention were formerly jails and prisons that were

shut down due to abusive conditions.[9]

Immigrants detained at these facilities may face even more inhumane

conditions, including solitary confinement, inadequate medical care, and, in the

most severe cases, death.[10]  ICE has reported 66 deaths of immigrants in its

---

[7] *See* RFK Human Rights, Am. C.L. Union, et al., *Inside the Black Hole: Systemic Human Rights Abuses Against Immigrants Detained & Disappeared in Louisiana*, 16 (Aug. 2024) [hereinafter "*Inside the Black Hole*"], *available at* https://rfkhumanrights.org/wp-content/uploads/2024/08/Inside-the-Black-Hole_Systemic-Human-Rights-Abuses-Against-Immigrants-Detained.pdf.

[8] *See* Torrey, *supra* note 6, at 881.

[9] This pattern of repurposing former prisons has come to pervade immigration detention practices nationwide.  In Newark, for instance, ICE recently reopened Delaney Hall, a former prison that will now serve as a 1000-bed detention facility; on May 1, Delaney Hall received its first detainees following a closure that lasted nearly a decade.  Arelis B. Hernandez & Tobi Raji, *What to Know About Delaney Hall, Where Newark's Mayor Was Arrested*, WASH. POST (May 10, 2025), *available at* https://www.washingtonpost.com/nation/2025/05/10/delaney-hall-detention-facility-explained/.  Likewise, in Louisiana—the state which houses the second largest number of immigrants—many detention centers are former jails or prisons that were shut down due to abusive conditions, conditions which returned when the facilities were reopened as civil immigration detention centers beginning in 2017.  *See Inside the Black Hole*, *supra* note 7, at 17–18 (describing the continuation of abusive conditions that "led to [the] closures" of Louisiana "jails repurposed to incarcerate immigrants," including beating, sexual abuse, inadequate medical care, tear gassing, and pepper-spraying).

[10] *See* Temple Univ. Beasley Sch. L. Ctr. for Soc. Just., *In the Shadow of the Valley: The Unnecessary Confinement and Dehumanizing Conditions of People in Immigration Detention at Moshannon Valley Processing Center* 40 (2024)

custody between January 2018 and April 2025, with 11 deaths in 2024 and four deaths in the first four months of 2025.[11]  And as immigration detention has expanded in recent months, overcrowding has led to increasingly dangerous conditions for immigrants in the Government's custody, with the deaths of two immigrants detained at the overcrowded Krome Detention Center ("Krome") in Florida in less than a month serving as one tragic example.[12]

The Moshannon Valley Processing Center ("Moshannon"), where Messrs.

_____

[hereinafter "*In the Shadow of the Valley*"] (reporting 86 911 calls from Moshannon in an 18-month period, including one that "tragically ended in the drug overdose death of one person in detention" in December 2023), *available at* https://law.temple.edu/csj/2024/09/04/moshannan-valley-processing-center; Physicians for Hum. Rts., *"Endless Nightmare": Torture and Inhuman Treatment in Solitary Confinement in U.S. Immigration Detention*, 5 (Feb. 6, 2024) (reporting "more than 14,000 placements in solitary confinement between 2018 and 2023"), *available at* https://phr.org/wp-content/uploads/2024/02/PHR-REPORT-ICE-Solitary-Confinement-2024.pdf.

[11] *See Detainee Death Reporting*, ICE, *available at* https://www.ice.gov/detain/detainee-death-reporting (last visited May 13, 2025); *see also* Am. C.L. Union, *Deadly Failures: Preventable Death in U.S. Immigration Detention* 16 (June 2024) (reporting 70 deaths of immigrants in ICE custody between January 2017 and June 2024), *available at* https://assets.aclu.org/live/uploads/2024/06/2024-07-01-ICE-Detainee-Deaths.pdf.

[12] Nicholas Dale Leal, '*Inhumane Conditions' and Death at Miami's Krome Migrant Detention Center*, EL PAÍS (Apr. 1, 2025), *available at* https://english.elpais.com/usa/2025-04-01/inhumane-conditions-and-death-at-miamis-krome-migrant-detention-center.html; *see also Detention Facilities Average Daily Population*, TRAC [hereinafter "*Detention Facilities Average Daily Population*"] (reporting that Krome was nearing 120 percent of capacity as of March 17, 2025), *available at* https://tracreports.org/immigration/detentionstats/facilities.html (last visited May 13, 2025).

Abioye and Michelin were each detained for the majority of their time in immigration custody, is no exception. Since opening as an immigration detention facility in September 2021, Moshannon's substandard medical care, improper use of force, and physical and psychological mistreatment has been well-documented. In 2023, an individual died there while in ICE custody.[13] Today, Moshannon is the seventh-largest immigration detention facility in the United States, and the largest in the Northeastern United States, with an average daily population of 1,246.[14] Medical neglect and physical and psychological mistreatment are commonplace.[15]

Immigrants detained at Moshannon reported physical, emotional, and mental abuse from staff, including "physical violence," "withholding food, water, and sleep," "delay[ing]" or "withhold[ing] medical care," and "fail[ing] to provide appropriate interpretation" for non-English speakers.[16] A 2022 investigation by the Department of Homeland Security identified deficiencies in Moshannon's "address[ing] unsafe and avoidable takedown techniques" following use of force incidents, compliance with safeguards required by the Prison Rape Elimination

---

[13] *See In the Shadow of the Valley*, *supra* note 10, at 40.
[14] *Detention Facilities Average Daily Population*, *supra* note 12.
[15] *See In the Shadow of the Valley*, *supra* note 10, at 36–38 (describing detainees' inability to access timely, adequate treatment).
[16] *Id.* at 24.

Act, and provision of translation and interpretation for immigrant detainees.[17]

## B. Access to legal representation is in short supply.

Being detained without access to legal representation sharply limits an immigrant's ability to defend against deportation. Immigrants must marshal evidence to meet the demanding burden of proof for habeas relief. Yet, unlike in criminal proceedings, detained immigrants have no right to Government-appointed counsel to challenge their deportation or detention. *See* 8 U.S.C. § 1362 (permitting counsel to represent a person in removal proceedings "at no expense to the Government"). As a result, very few detained immigrants are able to access counsel in their underlying immigration case, let alone in habeas proceedings challenging their detention, which, as the Supreme Court recently noted, may be the sole avenue for immigrants detained pursuant to certain federal statutes to challenge their detention. *See, e.g.*, *Trump v. J. G. G.*, 145 S. Ct. 1003, 1005 (2025). While the Government does not collect data on detained immigrants' access to counsel,[18] data collected by the Immigration Transitional Records Access

---

[17] Dep't of Homeland Sec. Off. for C.R. & C.L., *Summary of CRCL's Recommendations and ICE's Response Moshannon Valley Processing Center* (June 23, 2023), *available at* https://web.archive.org/web/20250127102301/https://www.dhs.gov/sites/default/fil es/2023-09/23_0620_crcl-close-summary-ice-moshannon-valley-processing-center-06-20-23.pdf.

[18] *See* Dep't Homeland Sec. & U.S. Immigr. & Customs Enf't, *Access to Due Process: Fiscal Year 2021 Report to Congress* 2 (Feb. 14, 2022), *available at*

Clearinghouse ("TRAC") at Syracuse University shows that fewer than 30 percent of detained immigrants had legal representation between 2019 and 2024.[19]

Obtaining legal representation is particularly cost-prohibitive for detained immigrants, who cannot earn a living wage while incarcerated.[20] These cost concerns affect all detained immigrants, regardless of the merits of their underlying immigration cases or the unlawfulness of their ongoing detention.[21]

The difficulties of obtaining legal representation are exacerbated for the tens of thousands of immigrants detained by the Government in geographically isolated locations,[22] a practice that has become the norm in recent years[23] and that the

https://immigrantjustice.org/sites/default/files/content-type/commentary-item/documents/2022-03/ICE-Access-to-Due-Process.pdf.

[19] *New Proceedings Filed in Immigration Court*, TRAC [hereinafter "*New Proceedings Filed in Immigration Court*"], *available at* https://trac.syr.edu/phptools/immigration/ntanew/ (last visited May 8, 2025).

[20] *See* Ingrid V. Eagly & Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 Univ. Pa. L. Rev. 1, 34–36 (Dec. 2015).

[21] *See* Judge Robert A. Katzmann, *The Legal Profession and the Unmet Needs of the Immigrant Poor*, 21 Geo. J.L. Ethics 3, 5 (2008) ("Justice should not depend upon the income level of immigrants.").

[22] *See* Am. C.L. Union, *No Fighting Chance: ICE's Denial of Access to Counsel in U.S. Immigration Detention Centers* 10–11 (2022) [hereinafter "*No Fighting Chance*"], *available at* https://www.aclu.org/sites/default/files/field_document/no_fighting_chance_aclu_research_report.pdf.

[23] *See, e.g.*, Oliver Laughland, *'Detention Alley': Inside the Ice Centres in the US South Where Foreign Students and Undocumented Migrants Languish*, The Guardian (May. 29, 2025) (discussing the expansion of "the network of remote immigration detention centres that stretch between Texas, Louisiana and Mississippi, known as 'Detention Alley' – where 14 of the country's 20 largest

Government has increasingly relied on to raise jurisdictional challenges to habeas petitions.[24]  Some immigration detention centers "have only one immigration attorney within a 100-mile radius for every 200 people detained,"[25] while others are located over "100 miles from the nearest urban center,"[26] factors that make attorney visits "prohibitively difficult and expensive."[27]  Furthermore, the availability of counsel is highly arbitrary: a study comparing representation rates of detained immigrants in the 20 jurisdictions with the highest number of detained cases between 2007 and 2012 found that "the proportion of immigrants represented fluctuated by as much as 22 percentage points."[28]

detention centres are clustered"), *available at* https://www.theguardian.com/us-news/2025/mar/29/ice-detention-centers-immigration-asylum.

[24] *See, e.g.*, *Khalil v. Joyce*, No. 25-cv-01963 (MEF)(MAH), 2025 WL 972959, at *38 (D.N.J. Apr. 1, 2025) (concluding that the New Jersey district court's jurisdiction "is not defeated by the Petitioner having been moved to Louisiana"), *pet. for permission to appeal denied*, No. 25-cv-8019 (3d Cir. May 6, 2025); *Khan Suri v. Trump*, No. 1:25-cv-480 (PTG/WBP), 2025 WL 1310745, at *13 (E.D. Va. May 6, 2025) (concluding Eastern District of Virginia court has habeas jurisdiction despite transfer to Louisiana and noting similar pattern in recent cases); *Öztürk v. Hyde*, No. 25-cv-1019, 2025 WL 1318154, at *10 (2d Cir. May 7, 2025) (rejecting the Government's argument that detained noncitizen graduate student's transfer from Vermont to Louisiana while in Government custody stripped the Second Circuit of jurisdiction over habeas petition).

[25] *No Fighting Chance*, *supra* note 22, at 11.

[26] *Inside the Black Hole*, *supra* note 7, at 21.

[27] *Inside the Black Hole*, *supra* note 7, at 21.

[28] Ingrid V. Eagly & Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 UNIV. PA. L. REV. 1, 38 (Dec. 2015) (22 percent of immigrants detained in El Paso, Texas had legal representation while only 0.002 percent of immigrants detained in Tucson, Arizona had legal representation); *see*

Even those who manage to obtain legal counsel or are detained in facilities near their families can be affected, as the Federal Government regularly transfers detained immigrants to distant facilities throughout the course of their immigration proceedings, often with no advance notice.[29] Messrs. Abioye's and Michelin's experiences illustrate these constraints. Mr. Abioye was detained in rural Pennsylvania, hundreds of miles away from his child and community in Maryland. Mr. Michelin was transferred from that same detention center, which was hundreds of miles away from his family in Philadelphia, to a detention center even further from his family in Virginia while his habeas petition was pending in the District Court.

### C.     Access to counsel is crucial to navigating the complex legal regimes governing immigration detention.

Without counsel, detained immigrants are at a significant disadvantage in navigating the byzantine patchwork of immigration, administrative, and constitutional legal regimes to challenge the basis for their detention. The

---

*also* Judge Robert A. Katzmann, *Study Group on Immigrant Representation: The First Decade*, 87 FORDHAM L. REV. 485, 495 (2018) (reviewing statistics from 2011 that noncitizens transferred "to far-off detention centers" faced significant obstacles obtaining representation and 79 percent of immigrants detained outside of New York were not represented).

[29] *See* Sabrina Balgamwalla, *ICE Transfers and the Detention Archipelago*, 31 J.L. & POL'Y 1, 17–18 (2022); *see also* Alina Das, *Immigration Detention: Information Gaps and Institutional Barriers to Reform*, 80 U. CHI. L. REV. 137, 157–58 (2013) [hereinafter "*Immigration Detention: Information Gaps and Institutional Barriers to Reform*"].

"complex" set of statutes governing immigration detention, *see Zadvydas,* 533 U.S. at 700, is difficult for even experienced lawyers to navigate, *see, e.g., Castro-O'Ryan v. U.S. Dep't of Immigr. & Naturalization*, 847 F.2d 1307, 1312 (9th Cir. 1987) (noting "[w]ith only a small degree of hyperbole" that immigration laws are "second only to the Internal Revenue Code in complexity" (citation omitted)). Yet legal resources for detained immigrants representing themselves are scarce and often inaccessible, as detention center law libraries often do not contain materials in languages other than English, and translation and interpretation resources are scarce.[30] For detained immigrants who are illiterate, have a disability, or, as is increasingly the case, are minors,[31] law library materials may be entirely inaccessible without assistance. Thus, the services of an attorney are critical to the protection of each detained immigrant's rights.

Not only are detained immigrants with representation about six times as

---

[30] *See Inside the Black Hole*, *supra* note 7, at 34–35 (highlighting language-related denial of access to law libraries in Louisiana detention centers); *see also* Kathryn O. Greenberg Immigr. Just. Clinic, *Held Incommunicado: The Failed Promise of Language Access in Immigration Detention* 18 (Aug. 2024) (describing translation deficiencies leading to unnecessary medical procedures and devastating medical outcomes), *available at* https://cardozo.yu.edu/sites/default/files/2024-08/YU-101%20Held%20Incommunicado.pdf.
[31] *See, e.g.*, Fola Akinnibi and Rachel Adams-Heard, *Trump Administration Aims to Bring Back Detention Centers for Immigrant Kids*, BLOOMBERG (Mar. 21, 2025), *available at* https://www.bloomberg.com/news/articles/2025-03-21/trump-administration-plans-detention-centers-for-migrant-children.

likely to prevail in their immigration cases,[32] but they are also twice as likely to be granted a custody hearing[33] and four times more likely to obtain a release at such a hearing than those without representation.[34]

The data is similar in the immigration habeas context. One study found that, between 2010 and 2020, 85 percent of detained immigrants in Louisiana filed their habeas petitions without a lawyer, and those who had legal representation were nearly three times as likely to gain release from detention after filing a habeas petition.[35] Similarly, a three-year survey of immigration detention habeas petitions in Massachusetts found that 76 percent were filed *pro se*, which were less than one-sixth as likely to be granted as those filed by represented detained

---

[32] Steering Comm. of the N.Y. Immigrant Representation Study Report, *Accessing Justice: The Availability and Adequacy of Counsel in Removal Proceedings*, 33 CARDOZO L. REV. 357, 384 (2011).

[33] Ingrid V. Eagly & Steven Shafer, *Access to Counsel in Immigration Court*, AM. IMMIGR. COUNCIL, 16 (2016) (44 percent of represented detained immigrants obtained a custody hearing as opposed to 18 percent of those without legal representation), *available at* https://www.americanimmigrationcouncil.org/sites/default/files/research/access_to_counsel_in_immigration_court.pdf.

[34] *Id.* (44 percent of represented detained immigrants were released, as compared with only 11 percent of those unrepresented).

[35] *See* Laila L. Hlass & Mary Yanik, *No End in Sight: Prolonged and Punitive Immigration Detention in Louisiana*, TULANE UNIV. L. SCH. IMMIGR. RTS. CLINIC, 29 (May 2021) [hereinafter "*No End in Sight*"] (nine percent of unrepresented detained immigrants were released from detention, whereas more than 25 percent of represented people obtained release), *available at* https://law.tulane.edu/content/no-end-sight-prolonged-and-punitive-immigration-detention-louisiana.

immigrants.[36]  In 2024, less than half of detained immigrants with cases in the Elizabeth, New Jersey Immigration Court, where both Messrs. Abioye and Michelin had their bond hearings, had legal representation.[37]

Messrs. Abioye's and Michelin's cases are particularly illustrative of this larger trend.  Both languished in civil detention for over a year, unsuccessfully seeking to challenge the basis for their detention.  It was only after they obtained counsel that they were able to obtain habeas relief in federal court.

## II.    HABEAS PROCEEDINGS CHALLENGING CIVIL IMMIGRATION DETENTION ARE "CIVIL ACTIONS" UNDER EAJA.

EAJA permits recovery of attorneys' fees for successful litigants in "any civil action," a category that unambiguously includes civil immigration habeas actions.  28 U.S.C. § 2412(d)(1)(A).  The Government asks the Court to look beyond EAJA's plain language and apply the disfavored sovereign immunity canon of statutory construction, which "provides that waivers of sovereign immunity must be strictly construed in favor of the Government," to limit the scope of EAJA.  *F.A.A v. Cooper*, 566 U.S. 284, 289 (2012).  However, the

---

[36] Brief of Amicus Curiae Am. Immigr. Laws. Ass'n in Support of Appellant and Reversal, at 13, *Maldonado-Velasquez v. Moniz*, No. 17-cv-1918 (1st Cir. Nov. 28, 2017) (four percent of unrepresented detained immigrants received favorable habeas decisions, whereas 27 percent of represented detained immigrants received favorable decisions).
[37] *New Proceedings Filed in Immigration Court*, *supra* note 19.

sovereign immunity canon only applies if there is "ambiguit[y] in the statutory language." *Id.* at 290. Because "any civil action" is not ambiguous, the sovereign immunity canon does not apply. Not only does the Government's argument contradict the plain language of the Statute, but it also subverts Congress's aim of using EAJA to eliminate barriers that prevent people facing arbitrary governmental action, including unlawfully detained immigrants, from securing their rights.

## A. The plain language of EAJA unequivocally and unambiguously encompasses immigration habeas proceedings.

The statutory language of EAJA—"any civil action"—plainly covers habeas proceedings where a petitioner challenges civil immigration detention. 28 U.S.C. § 2412(d)(1)(A). The "cardinal canon" of statutory interpretation is the presumption "that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). Accordingly, the starting point for interpreting the scope of EAJA is its plain language. *See, e.g.*, *Handron v. Sec'y Dep't of Health and Hum. Servs.*, 677 F.3d 144, 149 (3d Cir. 2012) (beginning its analysis of EAJA by assessing "the plain text of the statute"). Where, as here, "the statutory language is plain and unambiguous, further inquiry is not required." *Rosenberg v. XM Ventures*, 274 F.3d 137, 141 (3d Cir. 2001).

Habeas proceedings were among the many types of "civil action[s]" familiar to Congress when it passed EAJA in 1980. *See, e.g.*, *Hilton v. Braunskill*, 481 U.S.

770, 776 (1987) ("Our decisions have consistently recognized that habeas corpus proceedings are civil in nature."); *Browder v. Dir., Dep't of Corr. of Ill.*, 434 U.S. 257, 269 (1978) ("It is well settled that habeas corpus is a civil proceeding."); *Fisher v. Baker*, 203 U.S. 174, 181 (1906) ("The proceeding is in habeas corpus, and is a civil, and not a criminal, proceeding."). As the Supreme Court has recognized, immigration habeas proceedings are no different. *See, e.g.*, *Zadvydas*, 533 U.S. at 690 (describing habeas petition challenging immigration detention as relating to "civil, not criminal" proceedings).

Thus, the statute's plain language makes clear that immigration habeas proceedings are civil actions under EAJA.

**B. The sovereign immunity canon of statutory interpretation does not apply in light of the unequivocal and unambiguous language of EAJA.**

The Government attempts to divert this Court's attention from the clear statutory language in EAJA, arguing that the sovereign immunity canon of statutory construction requires a narrow interpretation of EAJA that excludes immigration habeas proceedings. This argument is inapposite because EAJA's unequivocal and unambiguous language precludes application of the sovereign immunity canon and because the Supreme Court has sharply limited the applicability of the sovereign immunity canon when other canons of statutory construction apply.

To waive sovereign immunity, "Congress must speak unequivocally" in statutory text, and "[a]ny ambiguities in the statutory language are to be construed in favor of immunity." *Cooper*, 566 U.S. at 299 (citations omitted). This canon only applies when there is ambiguity in the language of the statute. The Government urges this Court to scrutinize the unmistakably clear waivers in EAJA to locate any possible ambiguity that might be used to narrow the waiver's scope. *See* Opening Brief for Appellants, *Abioye v. Warden Moshannon Valley Processing Ctr.*, No. 24-cv-3198, Dkt. 14, at 18–20 (3d Cir. Mar. 10, 2025) ("Appellants' Br."). But in enacting EAJA, Congress unequivocally waived sovereign immunity over "any civil action," which plainly encompasses immigration habeas proceedings. This Court should not second-guess Congress's choice.

> **1. EAJA's waiver of sovereign immunity for habeas proceedings challenging civil immigration detention is unequivocal.**

First, the Government misconstrues the requirement that a waiver of sovereign immunity be "unequivocally expressed" in statutory text, *Cooper*, 566 U.S. at 290, for a rule that habeas claims must be explicitly mentioned in EAJA, *see* Appellants' Br. at 16. The Supreme Court recently rejected a similar request to limit the scope of the Bankruptcy Code's waiver of sovereign immunity in *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, holding that

when statutory language "exudes comprehensiveness," Congress "need not use any particular words to make its abrogation intent clear."  599 U.S. 382, 388 (2023). Here, in stating that EAJA applies to "any civil action," "Congress did not cherry-pick *certain*" types of civil actions where the statute is meant to apply.  *Id.* at 390; *see also SAS Inst. Inc. v. Iancu*, 584 U.S. 357, 362 (2018) ("[T]he word 'any' naturally carries 'an expansive meaning'" (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997))).  Contrary to the Government's argument, EAJA's exclusion of civil actions "sounding in tort" does not negate the comprehensiveness of EAJA's waiver of sovereign immunity, *see* Appellants' Br. at 19, because when "Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent."  *United States v. Smith*, 499 U.S. 160, 167 (1991) (citation omitted).  Thus, EAJA unequivocally waives sovereign immunity.

### 2. Immigration habeas proceedings should not be treated differently from all other civil actions.

Faced with clear statutory language, the Government attempts to inject ambiguity into "any civil action," arguing that habeas proceedings are "unique" proceedings that should be singled out and excluded from all other types of civil proceedings.  *See* Appellants' Br. at 20–24.

But the fact that habeas petitions are not subject to *every* Federal Rule of Civil Procedure is of no moment.  Other civil actions for which EAJA fees are

available are not subject to certain Federal Rules.  For instance, district courts

routinely decline to apply Rule 56 in reviewing any final agency action.  *See, e.g.*,

*In re Fosamax (Alendronate Sodium) Prods. Liab. Litig.*, 118 F.4th 322, 345 n.20

(3d Cir. 2024) (noting that the "traditional" summary judgment standard is

"effectively modified" in cases involving review of agency decisions (citing *Merck*

*Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299, 317 (2019))).  Such actions

remain civil actions eligible for attorneys' fees under EAJA.  *See Tressler v.*

*Heckler*, 748 F.2d 146, 148 (3d Cir. 1984) (awarding EAJA fees in connection

with appeal of administrative law judge's decision in social security action).[38]

The Government's argument is akin to asserting that a goalkeeper is not a

soccer player because she, unlike her teammates, may touch the ball with her

hands.  And the approach would create ambiguity not from Congress's statutory

text, but rather solely based on judicial interpretation about the applicability of the

Federal Rules.  That is not the law.  *See Cooper*, 566 U.S. at 290 ("Any

---

[38] In 1985, Congress amended EAJA to make clear that "any civil action" includes "proceedings for judicial review of agency action."  *Johnson v. Gonzales*, 416 F.3d 205, 208 (3d Cir. 2005) (quoting 28 U.S.C. § 2412(d)(1)(A)).  The 1985 amendment was necessary because "another provision of the EAJA, codified at 5 U.S.C. § 504(b)(1)(C) (1982), explicitly precluded an award of attorney fees in connection with *agency* proceedings 'for the purpose of granting or renewing a license.'"  *Wilkett v. I.C.C.*, 844 F.2d 867, 870 (D.C. Cir. 1988).  That is, a significant prior question over the meaning of "any civil action" stemmed from an obvious inconsistency between two EAJA provisions.  The Government identifies no similar statutory inconsistency in challenging Messrs. Abioye's and Michelin's fee awards.

ambiguities in the *statutory language* are to be construed in favor of immunity[.]" (emphasis added)).

Habeas petitions are unambiguously civil actions. *See Zadvydas*, 533 U.S. at 690 (describing habeas petition challenging immigration detention as relating to "civil, not criminal" proceedings). Here, the District Courts docketed Messrs. Abioye's and Michelin's respective habeas petitions as "civil action[s]." *See Abioye v. Oddo*, 704 F. Supp. 3d 625 (W.D. Pa. 2023); *Michelin v. Oddo*, No. 3:23-cv-22, 2024 WL 3937228 (W.D. Pa. Aug. 26, 2024).

### 3. Habeas proceedings challenging immigration detention are not "hybrid."

The Government also attempts to distinguish habeas proceedings from other civil proceedings by labeling them "hybrid." Appellants' Br. at 11, 25. In support of this contention, the Government relies principally on *Santana v. United States*, 98 F.3d 752 (3d Cir. 1996), which is inapposite here. In *Santana*, the Court's characterization of habeas proceedings as "hybrid" related to criminal habeas proceedings in the context of the Prison Litigation Reform Act, not immigration habeas proceedings. *Id.* at 754. The Court used the "hybrid" label to "distinguish" the proceedings from purely "'criminal' proceedings, which are intended to punish and require various constitutional guarantees." *Id.* at 753–55. The Government provides no explanation of why this principle might apply with respect to the application of EAJA to civil immigration habeas proceedings. Nor does the

Government address *Santana*'s ultimate holding: that habeas petitioners are *exempt* from certain fees, rather than subject to additional fees. *Id.* at 756.

The lone additional in-circuit authority the Government cites in support of its "hybrid" theory, *Daley v. Federal Bureau of Prisons*, 199 F. App'x 119 (3d Cir. 2006), is likewise inapposite. *Daley* addressed a pro se litigant's application for attorneys' fees in connection with a criminal habeas petition, and the Court's denial of the application was rooted in the "well-established" "general requirement of attorney representation in order to collect attorney's fees." *Id.* at 121.

The other cases the Government references, *Ewing v. Rodgers*, 826 F.2d 967 (10th Cir. 1987), *O'Brien v. Moore*, 395 F.3d 499 (4th Cir. 2005), and *Boudin v. Thomas*, 732 F.2d 1107 (2d Cir. 1984), *see* Appellants' Br. at 27–28, are inapposite for the same reason. Each addresses the availability of EAJA fees in criminal rather than civil immigration habeas proceedings.

### 4. The Government's reliance on the sovereign immunity canon is misplaced.

"The sovereign immunity canon is just that—a canon of construction." *Richlin Sec. Serv. Co. v. Chertoff*, 553 U.S. 571, 589 (2008). It cannot and does not "displace[] the other traditional tools of statutory construction." *Id.*

The Supreme Court has declined to apply the canon to the Federal Tort Claims Act ("FTCA"), reasoning that "unduly generous interpretations of the exceptions run the risk of defeating the central purpose of the statute, which waives

the Government's immunity from suit in sweeping language." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 492 (2006) (internal citation and quotation marks omitted). And the Supreme Court declined to apply the canon when interpreting the scope of an FTCA exception on the basis that the text of the statute was clear. *See Kosak v. United States*, 465 U.S. 848, 853 n.9 (1984) (the Court's role in analyzing the FTCA's waiver of sovereign immunity "is to identify 'those circumstances which are within the words and reason of the exception—no less and no more.'" (cleaned up)). Here too, the language of EAJA is unambiguous, and the Court should not reach the sovereign immunity canon.

Given the Supreme Court's disinclination to apply the sovereign immunity canon in recent decades, a variety of jurists and scholars have questioned the utility of the strict construction of waivers, pointing out that its "rigidity made sense when suits against the government were disfavored, but not in modern times."[39] This Court need not apply this disfavored canon where, as here, the statutory language is clear.

---

[39] ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 285 (2012); *see also* Gregory C. Sisk, *Twilight for the Strict Construction of Waivers of Federal Sovereign Immunity*, 92 N.C. L. REV. 1245, 1254 (2014) (analyzing 21 Supreme Court decisions to demonstrate that "the hoary canon of strict construction for statutory waivers of sovereign immunity has fallen into twilight").

## C. Applying EAJA to immigration habeas proceedings is consistent with the Congressional purpose of eliminating barriers to remediate and deter unlawful governmental action.

Congress designed EAJA to ensure that individuals "will not be deterred from seeking review of, or defending against, unjustified governmental action because of the expense involved" in vindicating their rights. *Scarborough v. Principi*, 541 U.S. 401, 407 (2004) (quoting H.R. Rep. No. 99-120, at 4 (1980)). Unlawful detention of immigrants like Messrs. Abioye and Michelin is precisely the type of "unjustified governmental action" that EAJA intended to cover. Detained immigrants' confinement is ordered by a Government agency that "is represented by counsel at all times,"[40] frequently not subject to review by even an administrative law judge, let alone a criminal or Article III judge,[41] and can last years. Detained immigrants therefore face a heightened risk of "unjustified government action." *Cf. Zadvydas*, 533 U.S. at 690 ("Freedom from imprisonment—from government custody, detention or other forms of physical restraint—lies at the heart of the liberty [the Due Process] Clause protects."). Detained immigrants also face often insurmountable logistical and financial

---

[40] Johan Fatemi, *A Constitutional Case for Appointed Counsel in Immigration Proceedings: Revisiting Franco-Gonzalez*, 90 St. John's L. Rev. 915, 932 (2016).
[41] While removal orders are subject to review by federal courts of appeals, decisions denying bond are subject to only "limited review . . . by immigration judges, employees of the Executive Office for Immigration Review within the DOJ." *Immigration Detention: Information Gaps and Institutional Barriers to Reform*, *supra* note 29 at 147 n.48.

barriers to obtaining legal representation. Thus, detained immigrants are right at the heart of the category of individuals that Congress passed EAJA to help.

Beyond empowering individuals, including detained immigrants, to challenge unjustified governmental action, EAJA also serves to deter governmental overreach. EAJA is designed to hold Government agencies and departments accountable for actions that are "arbitrary, frivolous, unreasonable, or groundless," or "pursued in bad faith."[42]

Amici's experience shows that attorneys' fees under EAJA reduce unnecessary habeas litigation. Generally, when attorneys represent an immigrant with a strong habeas case, they will contact ICE directly to negotiate for the immigrant's release.[43] If the Government faces the prospect of paying attorneys' fees for unlawful detentions, the Government is incentivized to evaluate whether it can take a substantially justifiable position.[44] When the Government cannot justify

---

[42] H.R. Rep. No. 96-1418, at 14, 17 (internal quotations omitted).

[43] *See No End in Sight*, *supra* note 35, at 12 (describing voluntary administrative releases of immigrants as "shadow wins where the immigrant is released without court vindication" (internal quotations omitted)).

[44] This incentive is especially crucial when an immigrant is detained in a facility where the Government has contracted for a fixed monthly operating fee or a bed minimum. For instance, at Moshannon, where both Messrs. Abioiye and Michelin were detained, the Government must pay the facility operator, GEO Group, at least $2,862,718 per month, regardless of how many people are in detention at the facility. *See In the Shadow of the Valley*, *supra* note 10, at 13. At the Pike County Correctional Facility, where Mr. Abioye was detained for a period of time, ICE pays for 100 beds per month, regardless of whether those beds are full. Peter

its actions, in the experience of amici, it usually releases the immigrant and avoids paying potential attorneys' fees.  If a detained immigrant is released, the court avoids the burden of habeas litigation, and the immigrant avoids further months in detention.  But without the prospect of attorneys' fees, the Government has less incentive to release detained immigrants as part of settlement negotiations, putting the burden on a population Congress sought to empower and defend, as well as on the courts themselves.

---

Becker, *Pike County gets amended ICE prison contract for detaining illegal immigrants*, Tri-County Independent (Jan. 12, 2022), *available at* https://www.tricountyindependent.com/story/news/2022/01/12/ice-detainees-generate-4-2-million-year-pike-county/9094488002.  So the Government may be paying facility operators the same amount whether or not a habeas petitioner is released, making the savings on attorneys' fees even more significant.

## CONCLUSION

For the foregoing reasons, amici urge this Court to affirm the District

Court's orders and hold that EAJA makes attorneys' fees available to habeas

petitioners challenging their civil immigration detention.

Dated: May 16, 2025
       New York, New York

                    Respectfully submitted,

                    */s/ Samuel Levander*
                    Samuel Levander
                    Charity E. Lee
                    Sarah E. Libowsky
                    CLEARY GOTTLIEB STEEN &
                    HAMILTON LLP
                    One Liberty Plaza
                    New York, New York  10006
                    Telephone: (212) 225-2000
                    Fax: (212) 225-3999
                    slevander@cgsh.com
                    charitylee@cgsh.com
                    slibowsky@cgsh.com

                    *Counsel for Amici Curiae*

## CERTIFICATE OF BAR MEMBERSHIP

I hereby certify that I a member of the Bar of this Court.

Date: May 16, 2025

*/s/ Samuel Levander*
Samuel Levander

**CERTIFICATE OF SERVICE**

I hereby certify that on May 16, 2025, I electronically filed the foregoing

document and accompanying materials with the United States Court of Appeals for

the Third Circuit by using the appellate CM/ECF system.  I certify that all

participants in the case are registered CM/ECF users and that service will be

accomplished by the appellate CM/ECF system.


 Date: May 16, 2025                          */s/ Samuel Levander*
                                             Samuel Levander

# CERTIFICATE OF COMPLIANCE

1.      This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,034 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in size 14 Times New Roman font.

3.      In accordance with Third Circuit Local Appellate Rule 31.1(c), the text of Appellee's Brief, as electronically filed on May 16, 2025, is identical to the text of the Brief to be submitted in paper copy.

4.      Pursuant to Third Circuit L.A.R. 31.1(c), the undersigned hereby certifies that the text of the electronic brief filed with the Court is identical to the paper copies, that the virus detection program CrowdStrike has been run on the electronic file, and that no virus was detected.

Date: May 16, 2025                      */s/ Samuel Levander*
                                          Samuel Levander

## CORPORATE DISCLOSURE STATEMENT

I hereby certify, on behalf of amici curiae National Immigration Project, Robert F. Kennedy Human Rights, Center for Constitutional Rights, National Immigrant Justice Center, and American Immigration Lawyers Association, that there is no information to disclose pursuant to Fed. R. App. P. 26.1.

Date: May 16, 2025       */s/ Samuel Levander*
                                                Samuel Levander